## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., *by and through next friend* VANESSA FERNANDEZ; *and* Z.B., *by and through next friend* S.B.,

       *Plaintiffs*,

v.

KEN PAXTON, *in his official capacity as the Texas Attorney General*,

       *Defendant*.

Civil Action No. 25-cv-1662

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## I.     PRELIMINARY STATEMENT

1.     Texas has passed a law presumptively banning teenagers—and restricting everyone else—from accessing vast online libraries of fully protected speech. Sweeping even more broadly than the State's other recent attempts to childproof the internet, the Texas App Store Accountability Act, Tex. Bus. & Com. Code § 121.001 *et seq.* (Ex. 1), requires anyone in Texas to prove their age before downloading any mobile application content—from the ESPN and Wall Street Journal apps, to Coursera, Spotify, Audible, Kindle, and Wikipedia. Teenagers are banned from downloading any app—as well as paid content within any app—without parental consent. Parents must verify their identity and authority to provide such consent. And even willing parents may not provide blanket consent for their teenager to download apps, categories of apps, or paid content within apps—they instead must provide individual consent for every download.

2.     The Act violates the First Amendment on its face. Defying the Supreme Court's insistence that governments have no "free-floating power to restrict the ideas to which children may be exposed," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011), the Act imposes content-based prior restraints on speech that replace parents' freedom to moderate their children's access to sources for learning, communication, and creativity with "what the State thinks parents *ought* to want." *Id.* at 804. It thus violates the rules that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," and that the government has no "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 & 795 n.3 (citation and quotation marks omitted).

3.     Just as the government could not compel a bookstore to screen patrons and stop minors from purchasing any book without parental approval, the State cannot ban minors from downloading digital content though app stores or within apps without parental consent. The Act is

thus unlike the statute upheld in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025), as the Act targets and restricts access to "fully protected" materials, not just adult content that is unprotected as to minors. *Id.* at 482-85, 490-92 & n.12. Strict scrutiny applies, and the State fails that standard—especially given the less-restrictive voluntary parental controls available and the existing, more-targeted laws that Texas could instead enforce.

4.    Plaintiffs are Texans and Texas-based organizations whom the Act will restrict from communicating, accessing information, and engaging in protected expression. They include a student-run organization that uses mobile apps to promote civic engagement; a high-school journalist who uses apps to find news and information, research stories, and publish reporting; and a high-school student who uses apps to study, create art, and engage with others' expressive works. They bring this action to vindicate their First Amendment rights by obtaining an order invalidating and enjoining the Act's challenged provisions.

## II.    PARTIES

5.    Plaintiff Students Engaged in Advancing Texas (SEAT) represents a coalition of Texas students ranging from middle school- to college-age who seek to increase youth visibility and participation in policymaking. Approximately 50 percent of its members are under 18 years old. SEAT provides students with hands-on opportunities for engaging in advocacy, legislative efforts, and education on issues of importance to youths. SEAT primarily communicates with its members using the app Slack, and uses social media accounts on the Instagram, X, Facebook, and LinkedIn apps to share opportunities, news, and calls to action with Texas students. According to August 2025 analytics, roughly 11 percent of SEAT's Instagram audience is under 18 years old. SEAT's mission is to promote students' agency in policymaking to ensure that youths have a voice in the legislative process, especially regarding decisions that directly affect them.

6.    Plaintiff M.F. is a minor resident of Texas and a senior in high school. He

participates in debate at school and is a budding photographer. He uses a variety of app-based social media platforms on his iPhone and iPad—including Instagram, Pinterest, YouTube, and Reddit—to research topics for debate, read the news, connect with friends, find inspiration for his photography, and learn about new educational or professional opportunities (like leadership programs and internships). M.F. also uses apps like Illustrator, Adobe Lightroom, and Photoshop to edit his photography projects and create graphics for student groups at school.

7.     Plaintiff Z.B. is a minor resident of Texas and a junior in high school. She is an editor of her school's student newspaper, as well as a content creator who publishes educational content to her teen audience. She uses her iPhone and iPad to download social media and news apps—including Substack, Discord, and Instagram—to conduct interviews with news sources, communicate with her newspaper staff, and read the news and the works of other journalists. She also uses TikTok, CapCut, and Canva to film and edit videos and infographics for her TikTok and Instagram accounts, through which she shares material on study skills and financial literacy education with an audience of over 1 million viewers.

8.     Defendant Ken Paxton, the Texas Attorney General, is charged with enforcing the Act, *see* Tex. Bus. & Com. Code § 121.101, and is sued in his official capacity.

### III.    JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction over this action under 28 U.S.C §§ 1331 and 1343(a) because Plaintiffs' claims arise under the United States Constitution and the Civil Rights Act, 42 U.S.C. §§ 1983, 1988.

10.    This Court has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this dispute and award relief because the litigation presents an actual case or controversy within the Court's jurisdiction. *See also Ex parte Young*, 209 U.S. 123, 168 (1908).

11.    Venue is proper in this District because Defendant resides in this District, 28 U.S.C.

§ 1391(b)(1), and because substantial events material to Plaintiffs' claims occurred in this District, 28 U.S.C. § 1391(b)(2).

## IV.    FACTUAL ALLEGATIONS

12.    The Act restricts Texans' access to vast quantities of information and important fora for human communication. The burdens on speech are significant and impermissible.

### A.    App stores are libraries for digital content.

13.    App stores allow anyone with a smartphone and an internet connection to access the accumulated sum of virtually all recorded human knowledge.[1] On Apple's iOS App Store alone, more than 1 billion people have access to millions of apps, published by more than 30 million developers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023). Other major app stores in the United States include the Google Play Store for Android OS devices, the Amazon AppStore for Fire Tablets and Fire TV systems, the Galaxy Store for Samsung devices, and the Microsoft Store for Surface devices. Most Americans, and nearly all teenagers, use app stores to access, engage with, and contribute to the information and expression disseminated online.[2] Mobile applications are thus by many measures the dominant fora in which humankind— and especially young people—speak, communicate, and express themselves.

---

[1] Nicole Shekhovtsova & Marc Scribner, *The App Store Accountability Act would undermine privacy and parental choice*, REASON FOUND. (MAY 7, 2025), https://reason.org/backgrounder/the-app-store-accountability-act-would-undermine-privacy-and-parental-choice (last visited Oct. 1, 2025).

[2] *See Sensor Tower: Consumer Spending on Apps Soared in 2024 and Mobile Rode the Wave of AI Enthusiasm*, PR NEWSWIRE (Jan. 22, 2025), https://www.prnewswire.com/news-releases/sensor-tower-consumer-spending-on-apps-soared-in-2024-and-mobile-rode-the-wave-of-ai-enthusiasm-302356483.html (last visited Oct. 1, 2025); *Teens and Internet, Device Access Fact Sheet*, PEW RSCH. CTR. (July 10, 2025), https://www.pewresearch.org/internet/fact-sheet/teens-and-internet-device-access-fact-sheet (last visited Oct. 1, 2025); Laura Ceci, *Mobile app usage of children in the United States - statistics & facts*, STATISTA (Nov. 22, 2024), https://www.statista.com/topics/10106/mobile-app-usage-of-children-in-the-united-states/#topicOverview (last visited Oct. 1, 2025).

14.    App stores deliver and facilitate speech in every imaginable way, serving as the gateway to the applications through which users access the internet. Some of those applications, such as Wikipedia, search apps, and internet browsers, are tools to search and discover all the information that exists online. Others, such as WhatsApp and Slack, provide messaging services for directed communication. Audible, Kindle, Netflix, Spotify, YouTube, and similar apps contain libraries of copyrighted music, movies, television shows, books, audiobooks, and podcasts. Coursera, Codecademy, and Duolingo provide access to educational programming. Media organizations like the New York Times, the Houston Chronicle, the Wall Street Journal, ESPN, Sports Illustrated, and the Atlantic offer apps that distribute reporting, essays, and videos. Some apps, like Substack, Medium, SoundCloud, and CapCut, function as publishing studios to create and share writing, music, videos, and other expressive content. Gaming applications like Roblox and Minecraft publish creative interactive worlds for exploration and entertainment. And of course social media apps like X, Facebook, Instagram, TikTok, Reddit, and Snap provide fora for sharing digital media. In short, the information distributed through apps is "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 852 (1997) (internal quotation marks and citation omitted).

   **B.    Plaintiffs use app-store distributed applications for expression, communication, education, and advocacy.**

15.    Plaintiffs use a variety of applications that they download from app stores as a regular part of their daily lives. These applications include but are not limited to the following:

16.    ***Messaging apps***. Numerous apps allow students to communicate with each other and with trusted adults. For example, schools use certain apps for communication among students and teachers. Plaintiff Z.B. uses the Discord app to communicate with her student newspaper team and track deadlines and story assignments. Plaintiff M.F. uses the app BAND to communicate with members of his debate team regarding practices, competitions, and deadlines. Plaintiff SEAT uses

the Slack app to coordinate its internal operations and communicate with members participating in political-action events like SEAT's "Advocacy Day"—an event where students from across Texas travel to Austin to meet with their elected officials during the legislative session. SEAT also uses the Signal app to communicate with other groups about opportunities for on-the-ground advocacy.

17.     ***Content library apps***. Certain apps function as libraries for books, music, and video content that allow both teens and adults to access and enjoy a wide range of expressive and informational material. Spotify, for example, hosts music and podcasts. Audible offers audiobooks and podcasts. And Libby allows users to "borrow" e-books from public libraries. Video-content libraries, such as YouTube and Prime Video, are especially popular with teens. YouTube in particular is "the most widely used platform," used by around 90 percent of teens,[3] and has a "staggering" volume and variety of video content.[4] Z.B. and M.F., for example, are both avid documentary viewers. They use apps including Prime Video, YouTube, and Apple TV+ to stream movies and rent documentaries on subjects they learn about in school and through their extracurricular activities like the debate team and newspaper.

18.     As a result of their ubiquity and variety, video library apps in particular are a popular forum for learning about new topics—more so than traditional books or websites. YouTube, for example, operates a channel called YouTube Teachers, where teachers can share

---

[3] Monica Anderson et al., *Teens, Social Media and Technology 2023,* PEW RSCH. CTR. (DEC. 11, 2023),     https://www.pewresearch.org/internet/2023/12/11/teens-social-media-and-technology-2023 (last visited Oct. 1, 2025).

[4] Patrick Van Kessel et al., *A Week in the Life of Popular Youtube Channels,* PEW RSCH. CTR. (JULY 25, 2019), https://www.pewresearch.org/internet/2019/07/25/a-week-in-the-life-of-popular-youtube-channels (last visited Oct. 1, 2025).

lessons.[5] Teachers "Rob and Jeremy" (@mathantics) share lessons on algebra and geometry with their 3.28 million YouTube subscribers. Science teacher and author Dave Farina (@ProfessorDaveExplains) posts study guides and lessons in high school physics and biology to his 3.19 million YouTube subscribers. And Phillip Cook (@chemteacherphil) shares chemistry lessons with his 1.14 million YouTube subscribers.

19.    Z.B. has used general-purpose apps like Instagram, TikTok, and YouTube not only to view explanatory "crash course" style videos, but to post similar instructional content to educate other teens about financial literacy and skills to improve their academic performance.

20.    M.F. relies on the internet to research topics for debate. He has found YouTube to be particularly helpful in preparing for debate tournaments and other school projects, as it gives him access to a large library of political speeches and documentaries concerning social, historical, and political issues. M.F. generally learns about current events from social media posts, then finds an explanatory YouTube video to obtain further information.

21.    ***Educational apps.*** In addition to all-purpose online content apps, many mobile apps are developed specifically for educational purposes. Apps like Chegg, Quizlet, and Course Hero provide students with on-demand tutoring, study guides, tutorials, and course reviews for subjects like English, social studies, foreign languages, and STEM disciplines.

22.    Z.B. uses a wide variety of such apps for educational purposes, including Khan Academy, which she uses to study for exams such as the SAT and Advanced Placement tests; Duolingo, a game-based language learning app; and IXL, which she uses to review her mathematics class material and solve practice problems.

23.    ***News apps***. Mobile apps have become a major distribution method for both

---

[5] YouTube Teachers, https://www.youtube.com/teachers (last visited Sept. 16, 2025).

traditional and non-traditional news platforms. Of the 105 most-visited news outlets in 2023, around three quarters had dedicated mobile apps, and at least 92 percent were available through news-aggregator apps like Flipboard.[6] Teenagers use these apps. Z.B., for example, is interested in pursuing a career in finance and follows news using the CNBC app. Z.B. also reads journalism published independently on the subscription platform Substack.

24.    *Content creation apps*. In addition to apps allowing users to view and engage with content, apps like CapCut and Canva—as well as apps like TikTok, YouTube, Pinterest, and Instagram—allow users to create content. SEAT often shares infographics it creates using Canva on social media to provide its current and prospective members with information about pending legislation, details on upcoming political actions, and instructions on how to contact state representatives to ensure that youth voices are heard. Z.B. uses the video editing app CapCut to set her educational slideshows to music and to create photomontages to accompany her motivational content.

25.    Individuals and businesses also use mobile apps for editing photos and presentations and sharing downloadable creative materials. M.F., for example, has used Illustrator to design flyers for his school's Distributive Education Clubs of America (DECA) team, which competes in business-oriented competitions against other schools. As a budding photographer, M.F. also uses apps like Photoshop and Illustrator to edit his photos for personal use and for inclusion in his school newspaper. M.F. has also downloaded editing presets for his photo-editing apps from other photographers, who share them on platforms like Pinterest and Instagram.

26.    *Social media apps*. Social networks provide platforms for communication,

---

[6] *Digital News Fact Sheet,* PEW RSCH. CTR. (Nov. 10, 2023), https://www.pewresearch.org/journalism/fact-sheet/digital-news/ (last visited Oct. 1, 2025).

expression, education, and association. Approximately 90 percent of teenagers between ages 13 and 17 have at least one social network account.[7] More than half of teens use TikTok, Snapchat, and Instagram.[8] All of these platforms were created as mobile apps and are designed primarily for mobile app usage.[9] SEAT, M.F., and Z.B. use social media apps, including Instagram, TikTok, and Pinterest. On Instagram, Z.B. and her student paper share news articles as well as audiovisual exclusives on school events. SEAT uses Instagram to collaborate with other organizations on educational content regarding pending legislation in Texas. M.F. uses Instagram to connect with peers and teammates, and to follow photographers for inspiration and photo editing tips. On TikTok, Z.B. shares slideshows and video content with over 1 million teens to help them study and navigate high school academics.

27.    Social networking apps are integral to modern life, for both teens and adults. Among other things, social networks provide an essential outlet for political expression. Youth-led movements have used social media to bring attention to issues not adequately covered in traditional media. Students at Marjory Stoneman Douglas High School in Parkland, Florida, have used social networks to advocate for gun violence prevention after a school shooting there killed

---

[7] Susan Laborde, *Teenage Social Media Usage Statistics in 2023*, TECHREPORT (updated May 30, 2024), https://perma.cc/A2JH-QNHH.

[8] *See* Anderson, *supra* n.3.

[9] Rebecca Fannin, *The Strategy Behind Tiktok's Global Rise,* HARV. BUS. REV. (SEPT. 13, 2019), https://hbr.org/2019/09/the-strategy-behind-tiktoks-global-rise [https://perma.cc/K7JA-XYR9] (last visited Oct. 1, 2025); Keving Systrom, *Introducing Your Instagram Feed on Desktop,* INSTAGRAM (FEB. 5, 2013), https://about.instagram.com/blog/spark/announcements/introducing-your-instagram-feed-on-desktop [https://perma.cc/2XNW-LMBF] (last visited Oct. 1, 2025); Jonathan Vanian, *Snapchat is finally coming to the web after more than a decade as a mobile app,* CNBC (JULY 18, 2022), https://www.cnbc.com/2022/07/18/snapchat-is-coming-to-the-web-after-more-than-a-decade-as-a-mobile-app.html [https://perma.cc/JU62-T7LA ] (last visited Oct. 1, 2025).

seventeen people.[10] Middle- and high-school students have used social media to create a national network of "Sunrise Movement" chapters to combat climate change.[11] And the libertarian non-profit BASEDPolitics uses social media to "introduce young people 'to the ideas of free market capitalism and individual liberty.'"[12] SEAT uses social networks to encourage Texas students to participate in school board hearings and local legislative efforts. Plaintiffs M.F. and Z.B. have both learned about their peers' political views through social media apps like Instagram and TikTok.

28.    Politicians and lawmakers similarly use social networks to communicate with voters (including teenage voters), as well as teens approaching voting age.[13] Social media is "near ubiquitous among members of Congress."[14]

29.    Social networks are a principal source of news for most Americans.[15] More than

[10] Jonah E. Bromwich, *How the Parkland Students Got So Good at Social Media*, N.Y. TIMES (Mar. 7, 2018), https://www.nytimes.com/2018/03/07/us/parkland-students-social-media.html [https://perma.cc/H42Y-TDEK] (last visited Oct. 1, 2025).

[11] Emma Weber, *How Young People Make Change,* THE PROGRESSIVE MAG. (Apr. 22, 2025), https://progressive.org/magazine/how-young-people-make-change-weber-20250422 [https://perma.cc/24Y6-YJGY] (last visited Oct. 1, 2025).

[12] Elizabeth Nolan Brown, *'If They Can Control the Flow of Information They Can Control You': BASEDPolitics Sues To Stop TikTok Ban,* REASON (JUNE 10, 2024), https://reason.com/2024/06/10/if-they-can-control-the-flow-of-information-they-can-control-you-basedpolitics-sues-to-stop-tiktok-ban [https://perma.cc/9LME-YVZD] (last visited Oct. 1, 2025).

[13] Laura Barron-Lopez et al., *How social media influencers are playing a role in the presidential election*, PBS NEWS (Mar. 19, 2024), https://www.pbs.org/newshour/show/how-social-media-influencers-are-playing-a-role-in-the-presidential-election (last visited Oct. 1, 2025).

[14] Patrick Van Kessel et al., *The congressional social media landscape*, PEW RSCH. CTR. (July 16, 2020), https://www.pewresearch.org/internet/2020/07/16/1-the-congressional-social-media-landscape [https://perma.cc/YS6K-UGFE] (last visited Oct. 1, 2025). In 2021 alone, congressional representatives published more than 477,000 Twitter (now "X") and nearly 300,000 Facebook posts. Stacy Jo Dixon, *Total number of posts per platform by U.S. Congress members 2021*, STATISTA (July 11, 2025), https://www.statista.com/statistics/958814/total-number-posts-per-platform-congress-members-usa [https://perma.cc/BVB5-GEQV] (last visited Oct. 1, 2025).

[15] Jeffrey Gottfried & Elisa Shearer, *News Use Across Social Media Platforms 2016*, PEW RSCH. CTR. (May 26, 2016), https://www.pewresearch.org/journalism/2016/05/26/news-use-across-social-media-platforms-2016 [https://perma.cc/R39S-2FU6] (last visited Oct. 1, 2025).

half of teens access news using social networks at least a few times per week, including on Instagram, Facebook, and X.[16] M.F. uses social media to obtain news about politics. Just this year, for example, he found out about the Texas Democrats' plan to interrupt the legislature's redistricting vote on X, where lawmakers posted their announcements and reactions. Z.B., who is a student journalist, gathers news from social networking sites like X and shares her own journalism through social media platforms like Instagram. Z.B.'s high school newspaper publishes reporting and important information on its Instagram account—which is the primary source for this information for most of her classmates.

30.    Social media is also an "important venue for interaction and conversation among" American teenagers and "plays a critical role in connecting teens to new friends" by "allowing teens to learn more about new friends and get to know them better."[17] M.F. and Z.B., for example, regularly use social media to connect with new and old friends alike. One recent study found teenagers who use social networks reported that they feel more connected to their friends (80 percent); had somewhere to express their creativity (71 percent); had a support network in challenging times (67 percent); and were more accepted (58 percent).[18] Overall, U.S. teenagers are

---

[16] Common Sense Media, *New Survey Reveals Teens Get Their News From Social Media and YouTube* (Aug. 12, 2019), https://www.commonsensemedia.org/press-releases/new-survey-reveals-teens-get-their-news-from-social-media-and-youtube [https://perma.cc/G3JD-5SPB] (last visited Oct. 1, 2025); *see also* Michael Boulter & Lizz Bolaji, *In the age of memes, how are young people getting their news?*, PBS NEWS HOUR (Jan. 23, 2020), https://www.pbs.org/newshour/nation/in-the-age-of-memes-how-are-young-people-getting-their-news (last visited Oct. 1, 2025).

[17] Amanda Lenhart, *Chapter 4: Social Media and Friendships*, PEW RSCH. CTR. (Aug. 6, 2015), https://www.pewresearch.org/internet/2015/08/06/chapter-4-social-media-and-friendships [https://perma.cc/DF3Y-PPG2] (last visited Oct. 1, 2025).

[18] Emily A. Vogels & Risa Gelles-Watnick, *Teens and social media: Key findings from Pew Research Center surveys*, PEW RSCH. CTR. (Apr. 24, 2023), https://www.pewresearch.org/short-reads/2023/04/24/teens-and-social-media-key-findings-from-pew-research-center-surveys [https://perma.cc/DF3Y-PPG2] (last visited Oct. 1, 2025).

more likely to report that social networks have positive rather than negative effects on their lives.[19] In fact, research suggests that the isolation that results from disconnecting teens from social networks may harm be more harmful to their self-esteem and well-being than is heavy use of the medium.[20]

31.     Finally, discussion- or "Q&A"-based social networking apps—such as Reddit, Quora, and Goodreads: Book Reviews—provide content about topics ranging from "How-To" videos for home improvement projects to personal finance tips to book reviews.[21] Reddit subgroups for craft projects, yoga, meditation, baking, and running each have more than 1.8 million members,[22] and groups for gardening and woodworking each have more than five million members.[23] M.F. sometimes accesses Reddit for advice on topics like preparing for college and his career, and to help him understand mathematical and scientific concepts that he is studying in school.

32.     The role of social networks in fostering community and connection—what some

---

[19] *Id.*

[20] Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41:2 SOC. SCI. COMP. REV. 626 (Aug. 5, 2022); *see also* Sarah Coyne et al., *Teaching By Example: Media and Parenting Practices that are—and are not—Related to Adolescent Mental Health*, WHEATLEY INST. (2022), https://wheatley.byu.edu/00000182-8d78-dff6-afab-8ffd11ce0001/teaching-by-example-pdf (last visited Oct. 1, 2025).

[21] Reddit, r/DIY, https://www.reddit.com/r/DIY/ (last visited Sept. 16, 2025) (DIY Reddit has 27.3M members); Reddit, r/personalfinance, https://www.reddit.com/r/personalfinance/ (last visited Sept. 16,, 2025) (Personal Finance Reddit has 2.3M weekly visitors).

[22] Reddit, r/crafts, https://www.reddit.com/r/crafts/ (last visited Sept. 16, 2025); Reddit, r/yoga, https://www.reddit.com/r/yoga/ (last visited Sept. 16, 2025); Reddit, r/Meditation, https://www.reddit.com/r/Meditation/ (last visited Sept. 16, 2025); Reddit, r/Baking, https://www.reddit.com/r/Baking/ (last visited Sept. 16, 2025); Reddit, r/running, https://www.reddit.com/r/running/ (last visited Sept. 16, 2025).

[23] Reddit, r/gardening, https://www.reddit.com/r/gardening/ (last visited Sept. 16, 2025); Reddit, r/woodworking, https://www.reddit.com/r/woodworking/ (last visited Sept. 16, 2025).

researchers have called the development of one's social, religious, cultural, ethnic, sexual and political identities—is one of their most profound contributions.

### C. Texas enacts the App Store Accountability Act.

33.     On May 27, 2025, Texas Governor Greg Abbott signed the Act. The Act takes effect January 1, 2026, when it will become enforceable by the Texas Attorney General. *See* Tex. Bus. & Com. Code § 121.101.

34.     The Act restricts and burdens speech in a variety of ways. Broadly, the Act creates age-verification and parental-consent mandates, under which minors may not download apps or paid purchases within apps without parental consent. The Act regulates both app stores and the app developers whose apps appear in those stores. It additionally requires app developers to assign, and app stores to display, age ratings and content notices for applications.

35.     ***Scope and exemptions***. The Act governs "app stores"—defined as any website, software, or other electronic service "that distributes software applications … to the user of a mobile device" such as a smart phone or tablet, *id.* § 121.002(2)—and "software application developers" who make software available to users in Texas "through an app store." *Id.* § 121.051.

36.     The Act applies only to app downloads—and paid purchases within apps—on mobile devices, not pre-installed native apps, software available through web browsers, or apps available on non-mobile devices such as internet-connected televisions. This leads to inconsistent regulation of the same apps, services, or content on different devices, as well as of the same types of apps on any given device.

37.     *First*, certain apps that are covered by the Act on some devices are outside the scope of the Act on other devices, depending on how those apps are distributed. The Apple Music app, for example, comes pre-installed on Apple iPhones but must be downloaded to Android phones and Samsung TVs. Of these uses, the app is subject to the parental-consent requirement only when

13

downloaded from an app store on an Android phone. And because any given person may own multiple devices, a different set of restrictions might apply to the same person on different devices—her Apple iPhone, Samsung Galaxy, Microsoft Surface, and Amazon Fire tablet, for example.

38.    *Second*, materially identical apps are regulated differently for the same person on the same device. For example, because the iMessage messaging app is preinstalled on iPhones but the Signal messaging app must be downloaded on iPhones, only the latter will be subject to the parental-consent requirement on an iPhone. Similarly, because Android phones comes preinstalled with Google Chrome but not Firefox, parental consent is only required for Firefox.

39.    *Third*, the requirement for parental consent before a minor "make[s] a purchase in or using" an app, Tex. Bus. & Com. Code § 121.022(d)(3), will apply differently to the same content across users. A minor who has the Disney+ app and a Disney subscription will not need parental consent to download *Finding Nemo*, yet another will require it to rent the movie in the Apple TV app—and neither will need consent to purchase the DVD at Best Buy.

40.    The Act exempts two categories of apps: (1) those that provide users "with direct access to emergency services," and (2) those "operated by or in partnership with a nonprofit" that "develops, sponsors, or administers a standardized test used for" admission to, class placement in, or program placement "in a postsecondary educational institution." Tex. Bus. & Com. Code § 121.022(h). This latter exemption again causes the Act to apply inconsistently to substantially identical apps. The Act exempts test prep apps published by nonprofit test administration companies—like the College Board's Bluebook app (which offers full-length practice tests) or ACT Online Prep—but applies to test prep apps published by other companies, like the nonprofit Khan Academy.

41.    ***Age-verification and parent-identification mandates.*** Before anyone in Texas may download content from an app store, the app store must use "a commercially reasonable method" to "verify the individual's age category." *Id*. § 121.021(a). Those categories are (i) child (younger than 13); (ii) younger teenager (13-15); (iii) older teenager (16-17); and (iv) adult (18 and older). *Id.* § 121.021(b).

42.    An app store may not permit anyone under 18 to download apps until the minor "affiliate[s] with a parent account belonging to the minor's parent or guardian." *Id*. § 121.022(a). Thus, any individual identified as a minor must identify his or her parent or guardian, and app store owners must then use "a commercially reasonable method" to verify that the prospective "parent account" in fact belongs to an adult with "legal authority to make a decision on behalf of the minor." *Id.* §§ 121.021(a), 121.022(b)(1)-(2).

43.    ***Parental-consent mandate***. Even if a minor affiliates with a parent or guardian, that does not mean the minor may download apps as the minor or her parents wish. Instead, *each time* a minor wishes to download an app from an app store—or purchase content within an app the minor has already downloaded with her parent's consent—that minor must "obtain consent" from her verified parent. *Id*. § 121.022(d)(1)–(3). Consent requires providing the parent an app's state-mandated age "rating," as well as the "content or other elements that led to the" rating. *Id.* § 121.022(f)(1)(A)–(E). Minors who cannot obtain consent may not access the content. *Id.* App stores must also share a user's age and parental-consent information with app developers, *id.* § 121.024(1), who are also required to ensure that minors lacking qualifying consent do not access their content. *Id.* § 121.054.

44.    Parents are prohibited from granting "blanket consent to authorize multiple downloads or purchases," *id*. § 121.026(a)(3), and must grant separate consent "for each individual

download or purchase sought by the minor." *Id*. § 121.022(e)(1). Even when a parent grants consent, an app store must revoke it whenever the application's content ratings, "functionality," or "user experience" undergoes a "material change." *Id.* § 121.022(g); 121.053(b).

45.    ***Enforcement.*** An app store that fails to enforce the State's restrictions may be punished under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.01 *et seq*. The statute permits penalties up to $10,000 per violation, *id.* § 17.46. Given the millions of app-store and app users in Texas, penalties under the Act could prove extraordinary.

### D.    The Act severely burdens and prevents speech.

46.    The Act creates significant and unjustifiable burdens on all Texans' ability to share and receive information and expression.

47.    ***The age-verification and parent-identification mandates create barriers to speech.*** The Act's age-verification mandate—which applies to all Texans, including adults—is by itself an invasive and significant barrier to speech. Age and identity-verification technologies force disclosure of sensitive personal information, such as a government-issued IDs, credit card information, or biometric data.[24] Many people would prefer not to disclose that information, and some may lack identity-verifying documents altogether.[25] When imposed, as here, as a precondition to engage in speech, the effects are to prevent speech before it can occur, and to raise the cost of engaging in any speech.[26]

---

[24] Eric Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 STAN. TECH. L. REV. 173, 202-03 (2025).

[25] Jillian A. Rothschild et al., *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2, Univ. Md. Ctr. for Democracy & Civic Engagement (June 2024); Shoshana Weissman, *Kids Don't Have IDs And Age-Estimation Tech Is Frequently Very Wrong*, TECH DIRT (May 23, 2025), https://www.techdirt.com/2025/05/23/kids-dont-have-ids-and-age-estimation-tech-is-frequently-very-wrong (last visited Oct. 1, 2025).

[26] *See* Goldman, *supra* note 24 at 216.

48.     These burdens are compounded for minors because the Act also requires their parent or guardian to submit official and sensitive documentation (like a birth certificate or adoption record) verifying their legal parental authority. This double-layered verification regime means a teenager's ability to access (or publish) content in an app store's content library is not only limited by their own willingness and ability to submit documents sufficient to verify their age, but also by their parents' willingness and ability to do so. And access is further limited by the parental-consent mandate, which not only requires parental consent before minors may obtain any apps or downloadable material within an app, but forbids those parents from providing blanket consent, even to specific categories of material. This reflects the Act's focus on burdening access to speech the State deems unsuitable, rather than on empowering parents.

49.     The effect in many, if not most, cases will approximate a ban. Americans—including Plaintiffs M.F., his mother, Vanessa, and SEAT—are skeptical about the security and reliability of age-verification. Sixty-six percent of Americans say they "are not comfortable sharing their identification documents or biometric information with online platforms," and 70 percent say they are "uncomfortable with their children using such methods." *Free Speech Coal., Inc. v. Rokita*, 738 F. Supp. 3d 1041, 1049 (S.D. Ind. 2024) (citing evidence) (alterations omitted), *vacated on other grounds*, 2025 WL 2027434 (7th Cir. July 15, 2025). Their reluctance is understandable. Available age-verification and parent-identification methods bear the risk that sensitive personal information and documents could be stolen or leaked.[27] Other nascent age-verification methods—such as artificial intelligence, facial analysis, or facial recognition—pose

---

[27] Jackie Snow, *Why Age Verification Is So Difficult for Websites*, WALL ST. J. (Feb. 27, 2022), https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-11645829728 [https://perma.cc/WA44-9ZW9] (last visited Oct. 1, 2025).

their own transparency, security, and privacy concerns.[28] Indeed, a recent data breach of an app that required identity verification through photos or IDs resulted in a trove of user photos and identification cards being leaked online, with the hackers reportedly creating a map to tie users to their locations.[29] Another recent breach of an age-verification vendor resulted in the leak of 70,000 Discord users' identification photos.[30] And numerous other age-authentication companies have suffered data breaches.[31] And in evaluating a California law imposing a similar age-verification mandate, the California Privacy Protection Agency confirmed that "there is currently no privacy-protective way to determine whether a consumer is a child."[32] Users who do not wish to expose themselves to the privacy risks associated with age verification—or whose parents, if they are minors, refuse to do so—will be shut out of app stores altogether.[33]

50.    The age-verification, parent-identification, and parental-consent mandates will restrict Plaintiffs' ability to share and receive information and expressive content. The app stores that Plaintiffs use have warned that under the Act, they will be required to impose the Act's censorship on users like Plaintiffs.[34] The effects will be real and immediate.

---

[28] *See* David McCabe, *Anonymity No More? Age Checks Come to the Web*, N.Y. TIMES (Oct. 27, 2021), https://www.nytimes.com/2021/10/27/technology/internet-age-check-proof.html (last visited Oct. 1, 2025).

[29] Isabella Kwai et al., *What to Know About the Hack at Tea, an App Where Women Share Red Flags About Men*, N.Y. TIMES (July 26, 2025), https://www.nytimes.com/2025/07/26/us/tea-safety-dating-app-hack.html (last visited Oct. 1, 2025).

[30] Osmond Chia, *ID photos of 70,000 users may have been leaked, Discord says*, BBC (Oct. 9, 2025), https://www.bbc.com/news/articles/c8jmzd972leo (last visited October 10, 2025).

[31] Goldman, *supra* note 24 at 202 n.129

[32] Memorandum from Maureen Mahoney, Deputy Dir. Pol'y & Legis., CAL. PRIV. PROT. AGENCY, to the Cal. Priv. Prot. Agency Bd. 5 (May 3, 2024), https://perma.cc/AGT5-KNUY.

[33] Goldman, *supra* note 24 at 204, 206-208 (discussing the tendency of users to "bounce"—i.e. abandon attempts to gain access—when presented with an age verification "wall").

[34] Letter from NetChoice to Gov. Abbott, Request for Veto of SB 2420 (May 15, 2025), https://netchoice.org/netchoice-letter-urging-texas-gov-greg-abbott-to-veto-sb-2420 [https://

51.     SEAT—which uses app-based platforms to share information and organize with, support, and educate high school age students—will be unable to reach audience members who are uncomfortable with submitting to age verification, as well as those who are under 18 and whose parents are not comfortable submitting to both age-verification and parent-identification processes. Z.B., who also uses app-based social media platforms to educate her teenage peers on financial literacy and study skills, may be effectively cut off from large swaths of her audience should those peers be unable to obtain parental consent to access Instagram and TikTok.

52.     M.F., who draws inspiration from the creative works of others, will have his own creative processes stifled by the need to obtain parental consent for each photo editing tool he wants to download while working on his photography projects. This would also pose challenges to M.F.'s ability to access educational materials needed for schoolwork—including learning apps, e-books, and documentaries—while his mother is at work, where she has limited access to her cellphone.

53.     ***The parental-consent mandate creates further barriers to speech.*** Even after a minor convinces a parent to provide documentation verifying that parent's legal authority, the Act bans that minor from downloading any additional apps from app store libraries, or purchasing paid content within already-downloaded apps—no matter the app or content at issue—unless the minor obtains approval from that verified parent each and every time they wish to access a new app or new paid content within an app.

54.     But for these requirements, app stores would not impose these barriers to speech.

perma.cc/4D2Z-84U5] (last visited Oct. 1, 2025); Letter from Chamber of Progress to Gov. Abbott, Veto SB 2420 and protect free speech (May 15, 2025), https://progresschamber.org/ resources/letter-to-tx-governor-veto-social-media-age-verification-proposal-sb-2420      [https:// perma.cc/P8RT-FSJX] (last visited Oct. 1, 2025).

As a result, the Act will cut off minors like M.F. and Z.B. from speech and speaking unless and until they can obtain consent. And organizations like SEAT will be impeded from disseminating political speech and advocacy campaigns to their intended audience. Even if Texas parents would be willing to consent to their children accessing particular content, the process of finding a verified parent, requesting consent, and then making that parent take the time to ratify the request impedes the free flow of information and, especially on the internet, creates delays that destroy speech.[35] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, *for even minimal periods of time*, unquestionably constitutes irreparable injury.") (emphasis added).

55.    The prohibition against blanket consent—further evidence that the Act's focus is restricting speech and not promoting parental control—amplifies this burden. It means that a minor must locate and harangue even a willing parent *each time* the minor discovers new material she wants to access—via a new app or a purchase in an existing app. That may not be possible for minors like M.F., whose mother works a job that does not allow her to access her personal device during business hours. Other parents also may not as a practical matter be able to constantly monitor their devices—due to travel, lack of internet connectivity, illness, or otherwise.

56.    An analogous brick-and-mortar regime—requiring a teenager entering a bookstore, for example, to FaceTime her parent, have that parent produce a birth certificate, and then supervise and approve the child's selection of titles to purchase at checkout—would strike the average American as a bizarre departure from our nation's traditions. Teenagers have long been free to hang around bookstores, newsstands, record stores, arcades, and multiplexes, spending

---

[35] Br. for Prof. Eric Goldman as Amicus Curiae, *NetChoice, LLC v. Bonta*, No. 5:22-cv-08861, ECF No. 34 at 5-7 (N.D. Cal. filed Feb. 24, 2023).

their pocket cash on new releases, comic books, vinyl albums, Pac-Man, and double-features.[36]

57.     It is hard to imagine what could justify this censorship. Even if the State could demonstrate minors need protection from *some* content on *some* apps (and it cannot), that does not justify effectively barring teenagers from *all* content on *all* apps. Nor can the Act be justified by a claim that it empowers parents. Many families will view the Act's top-down, one-size-fits-all granular oversight required by the parental consent provision as *undermining* parental choices about how to balance levels of autonomy, privacy, and supervision, which may be different for every child. M.F.'s mother Vanessa, for example, believes M.F. deserves and benefits from having a certain amount of privacy and autonomy, including over his digital activities. The Act would require her to intrude on M.F.'s privacy and autonomy to a degree she would not otherwise, effectively overriding her parental decision-making. These concerns are well founded: Studies have found that requiring parents to oversee and consent to their children's online activity can negatively affect the parent-child relationship.[37]

## V.    STANDING

58.     Speakers and listeners have standing to challenge government action that regulates the intermediaries they rely on to disseminate and access information when, but for the challenged government action, those intermediaries would continue to provide such access and use. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 & 757 n.15

---

[36] *See, e.g.*, Andrew O'Malley, *A Crisis of Innocence: Comic Books and Children's Culture 1940-1954* at § 3, TORONTO MET. UNIV. (Feb. 29, 2024), https://crisisofinnocence.library.torontomu.ca/exhibits/show/a-crisis-of-innocence/child-readers-of-comics (last visited Oct. 1, 2025) (describing comic book culture as "a print phenomenon operating by and large outside of adult control" with principal places of purchase at newsstands and drugstores).

[37] Mariya Stoilova et al., *Do parental control tools fulfill family expectations for child protection? A rapid evidence review of the contexts and outcomes of use*, 18 J. CHILDREN & MEDIA 29 (Oct. 29, 2023), available at https://perma.cc/AWV2-WXWK.

(1976); *Davis v. E. Baton Rouge Par. Sch. Bd.*, 78 F.3d 920, 926–27 (5th Cir. 1996).

59.    Plaintiffs have standing because (i) enforcement of the Act against app stores and developers will restrict Plaintiffs' constitutional rights to disseminate and access information through apps; (ii) those concrete injuries are traceable to government action—not the app stores and developers themselves—because the app stores and developers would continue to afford Plaintiffs and their members unrestricted access to and use of their services but for the Act, *see* Declaration of Matthew Bye ¶¶ 39-48 & Declaration of Matthew Schruers ¶¶ 45-55, *Comput. & Commc'ns Indus. Ass'n v. Paxton*, No. 1:25-cv-1660 (W.D. Tex., Oct. 16, 2025); and (iii) a favorable decision invalidating and enjoining enforcement of the Act would prevent the state action that causes Plaintiffs' injuries, thereby redressing those injuries. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

60.    This is true with respect to each portion of the Act Plaintiffs challenge and seek to enjoin. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

61.    With respect to the age-verification and parent-identification mandates, all Plaintiffs use and intend to continue using app stores and apps to send and receive information, and will be subject to the Act's invasive age-verification requirements and, in the case of the minor Plaintiffs M.F. and Z.B., its requirement that they link their account to an account of a parent who has also verified the parent's age and legal parental authority. All Plaintiffs will thus be restricted from and burdened in accessing fully protected speech disseminated through app stores, and unable to share information with or receive information from those minors with whom they want to exchange information but who are not willing to verify their own ages with app stores or whose parents are not willing to verify their ages and parental authority with app stores.

62.    With respect to the parental-consent mandate, M.F., Z.B., and SEAT's members

22

under the age of 18 use and intend to continue using apps regulated by the Act to send and receive information, and will be presumptively banned from doing so unless they obtain parental consent for each intended app download and purchase of protected speech content in or using an app. This restricts and burdens these Plaintiffs' access to, and ability to engage in, fully protected speech. All Plaintiffs, moreover, will be unable to share information with or receive information from minors with whom they want to exchange information whose parents are unwilling or unable to convey the consents required under the Act. At minimum, being forced to obtain parental consent to download an app or paid speech content within an app creates a barrier that burdens Plaintiffs' abilities to engage in protected speech.

## VI.    CLAIMS FOR RELIEF

63.    Plaintiffs raise a facial challenge to the Act's provisions codified in Tex. Bus. & Com. Code §§ 121.021, 121.022(a)-(b), 121.022(d)-(g), 121.024, 121.026(a)(3), 121.026(b), 121.053, 121.054, and 121.056(c). These provisions are facially invalid under the First Amendment because their unconstitutional applications are, at minimum, substantial compared to any legitimate sweep they might have. *United States v. Stevens*, 559 U.S. 460, 473 (2010).

64.    Plaintiffs also challenge these provisions as unconstitutional as applied to Plaintiffs' use of the app stores and apps covered by the Act.

### COUNT ONE

**VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS:**
**FREEDOM OF SPEECH**
**(All Challenged Provisions)**

65.    Plaintiffs incorporate all prior paragraphs of this Complaint.

66.    The First Amendment to the United States Constitution provides that government "shall make no law … abridging the freedom of speech, or of the press." U.S. CONST. amend. I. The First Amendment protects publishing, disseminating, creating, distributing, and consuming

speech. *Brown*, 564 U.S. at 792 & 792 n.1. The First Amendment's protections apply without qualification to speech communicated through the internet, *Reno*, 521 U.S. at 852–53, including through app stores that curate, host, and provide access to libraries of protected content. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 718-19 (2024); *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

67.    The government cannot bar minors from receiving protected speech without their parent's prior consent. *Brown*, 564 U.S. at 794-95 & 795 n.3. "Minors are entitled to a significant measure of First Amendment protection … and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 794 (citation omitted). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable." *Id.* at 795 (citation omitted). Nor may the government burden adults' ability to access and engage in "fully protected speech" in the name of protecting children. *Free Speech Coal.*, 606 U.S. at 482–87, 490–93 & 493 n.12.

68.    The Act's challenged age-verification, parent-identification, and parental-consent mandates violate Plaintiffs' First Amendment rights by banning and imposing preconditions on delivering and accessing protected speech that effectuates a system of prior restraint; restricting minors' First Amendment rights to access and disseminate constitutionally protected content; and burdening adults' access to fully protected speech, forcing them to sacrifice anonymity or privacy to exercise fundamental rights. These provisions are subject to at least strict scrutiny and cannot survive any level of First Amendment review.

69.     ***Prior restraint.*** The challenged provisions impose prior restraints on several levels, each of which is presumptively unconstitutional and subject to at least strict scrutiny.

70.     First, compelling app stores to collect age-identification information "as a condition of engaging in protected activity … impose[s] a form of prior restraint" because it formally restricts access to fully protected speech before it can occur and without adjudication. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 n.9 (1983) (citing cases); *see also Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316–17 (1980) (statutory precondition was prior restraint). The age-verification and parent-identification mandates thus constitute prior restraints by themselves. *See Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 277, 283 (5th Cir. 2003) ("pre-clearance" to distribute information was a prior restraint).

71.     Second, the parental-consent requirement that bans minors from accessing app-store distributed content unless a parent overrides that ban places a further formal preclearance requirement on protected expression. *See Brown*, 564 U.S. at 795 n.3.

72.     Third, the Act's overall age-verification and parental-consent scheme imposes a system of informal prior restraint and proxy censorship because it threatens intermediaries with civil liability to coerce them into censoring users' access to and ability to engage in speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70-71 (1963).

73.     Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity—and thus are subject to a more stringent standard than even strict scrutiny. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558–59 (1976) (citation omitted); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979). The challenged provisions cannot satisfy that standard, which requires showing the provisions supply the *only* means to address a "direct, immediate, and irreparable" interest of the highest magnitude.

*N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same).

74.    ***Content-based restrictions.*** Content-based regulations of speech are presumed unconstitutional and cannot survive review if they do not satisfy strict scrutiny. *Brown*, 564 U.S. at 799. The Act's age-verification, parent-identification, and parental-consent provisions are content-based for two reasons.

75.    First, the provisions are content-based because they are justified in terms of protecting children from app store content. *See* Tex. S. Comm. on State Affs., Substituted Comm. Rep. No. 89R21669 MLH-F on C.S.S.B. 2420, 89th Leg., Reg. Sess. (Mar. 31, 2025), (citing "growing concerns" that "pervasive[]" unmitigated access to app-store distributed content is harmful to "children and teens"); Texas Pub. Pol'y Found., *Testimony: Greyson Gee SB 2420*, YouTube (Mar. 31, 2025), (testifying that the Act would solve minors' "expos[ure] … to inappropriate content" on mobile apps), https://www.youtube.com/watch?v=j4DZAvnBeCw; *see also* Senate of Texas, *Senate Committee on State Affairs*, Interim Report, p. 22 (Jan. 2025), https://senate.texas.gov/cmtes/89/c570/c570_InterimReport_2024.pdf (before introduction of SB 2420, the Senate Committee on State Affairs "recommend[ed] that the Legislature consider further legislation to protect minors via age gating, *prevent their exposure to harmful materials*, protect mental health, and further prevent targeting via algorithms on social media platforms" (emphasis added)).[38] Legislating based on "concern for [speech's] effect" on a particular audience is "the

---

[38] Statements from the bill's sponsors and supporters confirm its content-based focus. *See* Senator Angela Paxton (@AngelaPaxtonTX), INSTAGRAM (Mar. 31, 2025), https://www.instagram.com/p/DH3n3dwsfDD/ (Senate sponsor stating that "[p]arents are constantly fighting to protect their children, especially from dangerous content on their phones, tablets, and other devices," and the Act is meant "to protect our children from inappropriate content"); Senator Angela Paxton (@AngelaPaxtonTX), INSTAGRAM (May 15, 2025), https://www.instagram.com/p/DJr1Vvcs6ux/ (Senate sponsor tweeting that the Act is meant to "help [parents] protect their children in the digital

essence of content-based regulation." *Playboy Ent. Grp*., 529 U.S. at 811-12.

76.     Second, the Act's definition of entities subject to the law makes any application of the Act's age-verification, parent-identification, and parental-consent mandates content-based burdens. This is because the Act arbitrarily exempts apps that provide "direct access to emergency services" and "standardized test[s] used for" "admission to" or placement "in a postsecondary educational institution." Tex. Bus. & Com. Code § 121.022(h). Because the Act thus "defin[es] regulated speech by particular subject matter," and therefore "singles out specific subject matter for differential treatment," *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 169 (2015), its every application is content-based and subject to strict scrutiny. *See Barr v. Am Ass'n of Pol. Consultants*, 591 U.S. 610, 619-21 (2020) (plurality op.) (law's content-based coverage exemptions rendered the law's entire operation content-based and subject to strict scrutiny).

77.     ***Strict scrutiny.*** The Act fails strict scrutiny because the State cannot show that any of the challenged provisions' restrictions of speech are both necessary and the least-restrictive means to serve a compelling government interest. *Playboy Ent. Grp*., 529 U.S. at 813.

78.     The State has not identified a concrete problem in need of a legislated solution, nor shown that the Act and each of the challenged provisions is necessary to that solution. If the

---

marketplace"); Senator Angela Paxton (@AngelaPaxtonTX), TWITTER (May 27, 2025, 3:53PM), https://x.com/AngelaPaxtonTX/status/1927498505670541789 (press release on the Act quoting House sponsor as saying "[t]he App Store Accountability Act is a commonsense safeguard that gives parents a say in what their kids access"); Caroline Fairly for Texas (@FairlyForTexas), TWITTER (June 18, 2025, 9:05AM), https://x.com/FairlyForTexas/status/1935368349803835461 (House sponsor tweeting that the Act's age verification requirement is meant to "creat[e] a safer tech environment for our kids"); Caroline Fairly for Texas (@FairlyForTexas), TWITTER (Apr. 27, 2025, 10:36AM), https://x.com/FairlyForTexas/status/1916547135354396931 (House sponsor tweeting that the Act is meant to stop "Big Tech" from "exploiting and endangering the innocence of our children"); Texas GOP (@Texas GOP), TWITTER (May 16, 2025, 8:45AM), https://x.com/ TexasGOP/status/1923404421532147764 (the Act "protects minors from abuse, exploitation, and trafficking by … [c]racking down on sexually inappropriate content").

problem concerns harms to minors from unregulated access to mobile apps, numerous existing solutions are more flexible and capable of being tailored to the needs of each individual child. The government's solution also overrides parental decision-making about how much or how little oversight is needed over each child's mobile app activities by mandating consent each and every time a minor seeks access to any covered app or content, rather than allowing parents to grant broader consent. *See Id.* at 826. That the State believes parents are failing to use existing parental control tools effectively is not a compelling government interest that justifies top-down, one-size-fits-all restriction. *See Brown*, 564 U.S. at 803; *accord Playboy Ent. Grp.*, 529 U.S. at 824.

79.    Nor is the Act necessary to promote parental authority. At every step, the Act's age-verification, parent-identification, and parental-consent mandates prioritize the government's desired content regulation over parental choices: Parents are required to micromanage their children's online access; forced to hand over sensitive legal documents and identification records to do so; and prevented from providing blanket consents even if they were willing to do so. The Act gives parents fewer, not more, options to tailor their families' digital media habits. Far from supporting parents, the Act imposes "what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 794-95, 804.

80.    Even if the State could demonstrate that the Act were necessary to accomplishing some compelling interest, the State cannot show that the Act and each of its challenged provisions is narrowly tailored and the least restrictive means to do so.

81.    The Act is overinclusive because it applies to all mobile applications (apart from the enumerated exceptions in Section 121.022(h)), and all downloadable content within those mobile applications, without regard for whether each of those apps and that content causes the harms the government alleges the Act addresses. The same is true insofar as the Act regulates and

treats all minors alike, regardless of differences in those minors' development or their parents' preferences. *See Reno*, 521 U.S. at 865–66.

82.    At the same time, the Act is underinclusive because it arbitrarily exempts pre-installed apps, services that are available through browsers and on non-mobile devices that convey the same information, and content (such as comic books, games, movies, and music) that is available in person.

83.    ***Intermediate scrutiny.*** The Act would be unconstitutional even if subjected to intermediate scrutiny, which requires a law (1) to serve a substantial government interest "unrelated to the suppression of free expression" by alleviating in "a direct and material way" harms that are "not merely conjectural," and (2) be narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662, 664 (1994) (citation omitted); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487, 491 (1995).

84.    Texas has done nothing to demonstrate either the existence or the magnitude of harm purportedly caused by the mobile apps and downloadable content that the Act regulates, or how the State's chosen solution will help. The State has made no effort to explain or substantiate how the Act's speech restrictions relate to or will measurably reduce the purported harms. The First Amendment does not permit the Government to restrict speech and then seek information to justify its actions. *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1128 (9th Cir. 2020) (doing so "reflect[s] a fundamental misunderstanding about the State's burden in justifying restrictions on speech").

85.    The Act's broad speech restrictions are the opposite of narrow tailoring: the Act restricts enormous swaths of speech on app-based channels on the theory that some speech for

some people is potentially harmful, while arbitrarily exempting classes of similarly situated media.

86.    ***Facial relief warranted.*** A law is facially invalid under the First Amendment if "a substantial number of [its] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). Facial relief is the natural remedy here because substantially all of the age-verification, parent-identification, and parental-consent provisions' applications are unconstitutional—and even the limited permissible applications to unprotected speech are irrelevant since Texas law *already* restricts online content unprotected for minors, *see City of L.A. v. Patel*, 576 U.S. 409, 418 (2015) (facial challenges concern applications that are not already legitimately authorized by other laws), including Texas law requiring users to verify they are adults before accessing pornography websites. *See* Tex. Civ. Prac. & Rem. Code Ann. §129B.001 *et seq.*

87.    At the first step, restricting access to information behind an age-verification wall "necessarily" burdens the "right to access speech" in every case. *Free Speech Coal.,* 606 U.S. at 495. At the second step—weighing the challenged provisions' unconstitutional applications against their constitutional ones—the substantial and "across the board" effect of the challenged provisions is to regulate speech without constitutional justification. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618-19 (2021). The facial analysis thus boils down to a comparison between the provisions' substantial regulation of protected speech (none of which the State can show is constitutional) versus the provisions' catch-as-catch-can regulation of *unprotected* speech or conduct the provisions *may incidentally* reach. The provisions are thus unconstitutional: Prophylactic blanket regulations of communication enacted to shield minors from potential exposure to unprotected speech present the archetype of overbroad legislation that "turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002).

"[Q]uarantining the general reading public … to shield juvenile innocence … burn[s] the house to roast the pig." *Butler v. Michigan*, 352 U.S. 380, 383 (1957); *see also Reno*, 521 U.S. at 882 (same).

88.    ***Defects not severable.*** The Act's unconstitutional and interlocking age-verification, parent-identification, and parental-consent mandates are integral to the Act, such that no other provisions could operate without them. The entire Act—and not just the challenged provisions— accordingly requires invalidation.

89.    Unless invalidated and enjoined, Tex. Bus. & Com. Code §§ 121.021, 121.022(a)-(b), 121.022(d)-(g), 121.024, 121.026(a)(3), 121.026(b), 121.053, 121.054, and 121.056(c) will deprive Plaintiffs of their First Amendment rights and cause them to suffer irreparable injuries.

## COUNT TWO

### VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: VOID FOR VAGUENESS
### (Tex. Bus. & Com. Code §§ 121.022(g), 121.053(b)(4))

90.    Plaintiffs incorporate all prior paragraphs of this Complaint.

91.    "It is essential that legislation aimed at protecting children from allegedly harmful expression—no less than legislation enacted with respect to adults—be clearly drawn and that the standards adopted be reasonably precise so that those who are governed by the law and those that administer it will understand its meaning and application." *Interstate Cir.*, *Inc. v. City of Dallas*, 390 U.S. 676, 689 (1968) (citation omitted).

92.    Vagueness in a law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech," *Brown*, 564 U.S. at 807 (citation omitted), requiring a "more stringent" test, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (citation omitted).

93.    Standards of "permissible statutory vagueness" are "strict in the area of free expression" and the "government may regulate in the area only with narrow specificity." *NAACP*

*v. Button*, 371 U.S. 415, 432-33 (1963).

94.     Tex. Bus. & Com. Code §§ 121.022(g) and 121.053(b)(4) require app stores to revoke a minor's access to content even to which their parent has consented, *id.* § 121.022(g), any time an application "materially changes" its "functionality or user experience," *id.* § 121.053(b)(4). The Act does not define what such a "material" change might include, and neighboring provisions indicate that it requires app stores to evaluate the ideas, information, and other types of content an application makes available. *Id.* § 121.053(b)(2).

95.     Without reasonable certainty what these inherently subjective terms mean, the "predictable tendency" is that app stores will overzealously revoke minors' access to information to avoid liability by "steer[ing] 'wide of the unlawful zone.'" *Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *see also Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

96.     Unless declared invalid and enjoined, Tex. Bus. & Com. Code §§ 121.022(g) and 121.053(b)(4) will for this additional reason unlawfully deprive Plaintiffs of their First Amendment and Due Process rights, causing them to suffer irreparable injuries.

## VII.    PRAYER FOR RELIEF

97.     WHEREFORE, Plaintiffs respectfully request that the Court:

a.      Declare that Tex. Bus. & Com. Code §§ 121.021, 121.022(a)-(b), 121.022(d)-(g), 121.024, 121.026(a)(3), 121.026(b), 121.053, 121.054, and 121.056(c) violate the First and Fourteenth Amendments of the United States Constitution on their face, and at least to the extent they are applied to restrict access to mobile applications that disseminate expressive content—including books, business information, content creation tools, education, entertainment, financial information, games, magazines, movies, music, news, reference information, social networking content, and travel information, among other materials—and to restrict access to such

32

content within such applications;

b.      Declare that Tex. Bus. & Com. Code §§ 121.021, 121.022(a)-(b), 121.022(d)-(g), 121.024, 121.026(a)(3), 121.026(b), 121.053, 121.054, and 121.056(c) are unconstitutional as applied to Plaintiffs;

c.      Declare that the unconstitutional provisions are integral to and inseverable from any remaining portions of the Act, such that the entire Act must be declared invalid;

d.      Preliminarily and permanently enjoin Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the unconstitutional provisions of the Act, or at least to the extent they are applied to restrict access to mobile applications that disseminate clearly expressive content;

e.      Enter judgment in favor of Plaintiffs;

f.      Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action, under 42 U.S.C. § 1988; and

g.      Award Plaintiffs all other relief as the Court deems just and proper.

*/s/      Erwin Reschke*
Erwin Reschke

Adam S. Sieff*
Haley B. Zoffer*
DAVIS WRIGHT TREMAINE LLP
350 S. Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone: (213) 633-6800
adamsieff@dwt.com
haleyzoffer@dwt.com

Abigail B. Everdell*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Telephone: (212) 603-6468
abigaileverdell@dwt.com

Ambika Kumar*
Erwin Reschke (TX Bar #24110264)
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Telephone: (206) 622-3150
ambikakumar@dwt.com
erwinreschke@dwt.com

David M. Gossett*
Celyra Myers*
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
Telephone: (202) 973-4200
davidgossett@dwt.com
celyramyers@dwt.com

*Attorneys for Plaintiffs*

*pro hac vice application forthcoming

October 16, 2025