# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |
|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., *by and through next friend* VANESSA FERNANDEZ; *and* Z.B., *by and through next friend* S.B., <br><br>                       *Plaintiffs*, <br><br> v. <br><br> KEN PAXTON, *in his official capacity as the Texas Attorney General*, <br><br>                       *Defendant*. | Civil Action No. 1:25-cv-1662 |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    A.    App stores are libraries for digital content.......................................... 2

    B.    Plaintiffs access app stores for educational, artistic, and political speech............. 3

    C.    Existing tools and laws already empower parents to control access to mobile apps and protect minors from adult content.................................. 4

    D.    The Act age-gates and imposes a mandatory parental preclearance regime for apps and app-based information.................................................. 4

LEGAL STANDARD............................................................................................ 7

ARGUMENT ..................................................................................................... 7

I.    Plaintiffs Are Likely To Prevail On The Merits. ......................................... 7

    A.    The Act restricts access to fully protected speech. ................................. 7

    B.    Strict scrutiny applies to the challenged provisions................................. 8

        1.    The challenged provisions create a system of prior restraint..................... 8

        2.    The challenged provisions cannot be justified without reference to the effect of content on its audience. ................................... 10

        3.    The challenged provisions are content-based because of the Act's coverage definition................................................................. 11

    C.    The challenged provisions fail any level of First Amendment scrutiny. .............. 12

        1.    The challenged provisions are not necessary to directly and materially address any real, compelling interest....................................... 12

        2.    The challenged provisions are not the least restrictive means, much less narrowly tailored.............................................................. 13

        3.    The challenged provisions are also substantially underinclusive. ............ 15

        4.    The challenged provisions fail even intermediate scrutiny...................... 16

    D.    The Act's "material change" provision is unconstitutionally vague. .................. 17

    E.    The Act's challenged provisions are facially invalid.................................. 18

II.    The Remaining Factors Favor A Preliminary Injunction. ................................ 20

III.    The Court Should Not Require A Bond.................................................. 20

CONCLUSION.................................................................................................. 20

CERTIFICATE OF SERVICE ............................................................................... 22

CERTIFICATE OF CONFERENCE.......................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Academy of Implant Dentistry v. Parker*,
    860 F.3d 300 (5th Cir. 2017) .........................................................................16, 17

*Americans for Prosperity Foundation v. Bonta*,
    594 U.S. 595 (2021) ........................................................................................17, 19

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ...............................................................................................11

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) ........................................................................................14, 20

*Baggett v. Bullitt*,
    377 U.S. 360 (1964) ...............................................................................................18

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) .............................................................................................8, 9

*Barr v. American Association of Political Consultants, Inc.*,
    591 U.S. 610 (2020) ...............................................................................................12

*Book People, Inc. v. Wong*,
    91 F.4th 328 (5th Cir. 2024) ..............................................................................7, 20

*Boos v. Barry*,
    485 U.S. 312 (1988) ...............................................................................................10

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011) ....................................................................................... *passim*

*Butler v. Michigan*,
    352 U.S. 380 (1957) ...............................................................................................20

*CCIA v. Paxton*,
    747 F. Supp. 3d 1011 (W.D. Tex. 2024) ...........................................................11, 14

*Chiu v. Plano Independent School District*,
    339 F.3d 273 (5th Cir. 2003) ...............................................................................10

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ...............................................................................................19

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Counterman v. Colorado*,
  600 U.S. 66 (2023)................................................................18

*Edenfield v. Fane*,
  507 U.S. 761 (1993)................................................................16

*Elrod v. Burns*,
  427 U.S. 347 (1976)................................................................20

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ....................................................2

*Express Oil Change, LLC v. Mississippi Board of Licensure
  for Professional Engineers & Surveyors*,
  916 F.3d 483 (5th Cir. 2019) ...................................................17

*FEC v. Cruz*,
  596 U.S. 289 (2022)................................................................16

*Free Speech Coalition, Inc. v. Paxton*,
  606 U.S. 461 (2025)...........................................................*passim*

*Free Speech Coalition, Inc. v. Rokita*,
  738 F. Supp. 3d 1041 (S.D. Ind. 2024) ................................ 9-10

*Greater New Orleans Broadcasting Association v. United States*,
  527 U.S. 173 (1999)............................................................ 16-17

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)....................................................................18

*Interstate Circuit, Inc. v. City of Dallas*,
  390 U.S. 676 (1968)............................................................9, 18

*Kaepa, Inc. v. Achilles Corp.*,
  76 F.3d 624 (5th Cir. 1996) .....................................................20

*Kennedy v. Bremerton School District*,
  597 U.S. 507 (2022)..................................................................8

*Mahanoy Area School District v. B.L.*,
  594 U.S. 180 (2021)................................................................13

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*,
  460 U.S. 575 (1983)..................................................................9

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)........................................................................7, 17, 18, 19

*NAACP v. Button*,
371 U.S. 415 (1963)................................................................................18

*Nebraska Press Association v. Stuart*,
427 U.S. 539 (1976)..................................................................................8

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .......................................................... 9, 13-14

*NetChoice, LLC v. Bonta*,
770 F. Supp. 3d 1164 (N.D. Cal. 2025) ...........................................11, 18, 19

*NetChoice v. Carr*,
2025 WL 1768621 (N.D. Ga. June 26, 2025) ........................................11, 14

*NetChoice, LLC v. Fitch*,
--- F. Supp. 3d ----, 2025 WL 1709668 (S.D. Miss. 2025)................................11, 14

*NetChoice, LLC v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ....................................11, 14

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)................................................11, 14

*NetChoice, LLC v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025) ...................................10, 11, 14

*New York Times Co. v. United States*,
403 U.S. 713 (1971)................................................................................8-9

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................................20

*Packingham v. North Carolina*,
582 U.S. 98 (2017)..................................................................................19

*Public Citizen Inc. v. Louisiana Attorney Disciplinary Board*,
632 F.3d 212 (5th Cir. 2011) .............................................................17

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)................................................................................12

## TABLE OF AUTHORITIES (continued)

**Page(s)**

*Reno v. ACLU*,
  521 U.S. 844 (1997)....................................................................................2, 7, 14, 20

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995)....................................................................................16

*SEAT v. Paxton*,
  765 F. Supp. 3d 575 (W.D. Tex. 2025)..............................................11, 14, 15, 19

*Smith v. Daily Mail Publishing Co.*,
  443 U.S. 97 (1979).......................................................................................8

*Snyder v. Phelps*,
  562 U.S. 443 (2011)....................................................................................13

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)..................................................................................8, 13

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975).....................................................................................9

*Speiser v. Randall*,
  357 U.S. 513 (1958)....................................................................................18

*Spirit Aerosystems, Inc. v. Paxton*,
  142 F.4th 278 (5th Cir. 2025) ......................................................................19

*Stahl v. City of St. Louis*,
  687 F.3d 1038 (8th Cir. 2012) .....................................................................18

*Texas VFW of United States v. Texas Lottery Commission*,
  760 F.3d 427 (5th Cir. 2014) .......................................................................15

*Turner Broadcasting System, Inc. v. F.C.C.*,
  512 U.S. 622 (1994)....................................................................................16

*United States v. Playboy Entertainment Group, Inc.*,
  529 U.S. 803 (2000)............................................................................. *passim*

*United States v. Williams*,
  553 U.S. 285 (2008)....................................................................................17

*Vance v. Universal Amusement Co.*,
  445 U.S. 308 (1980).....................................................................................9

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ................................................................................................................7

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................................... *passim*

**State Statutes**

Texas Business & Commerce Code

    § 17.01 ................................................................................................................................7

    § 17.41 ................................................................................................................................7

    § 121.001 ............................................................................................................................1

    § 121.002 ............................................................................................................................5

    § 121.021 ...........................................................................................................6, 8, 9, 20

    § 121.022 ................................................................................................................. *passim*

    § 121.024 ...........................................................................................................4, 6, 8, 20

    § 121.026 .........................................................................................................7, 8, 15, 20

    § 121.051 ........................................................................................................................4, 5

    § 121.052 ............................................................................................................................6

    § 121.053 .........................................................................................................7, 8, 17, 20

    § 121.054 ...............................................................................................................6, 8, 20

    § 121.056 ..........................................................................................................................20

    § 121.101 ............................................................................................................................4

Texas Civil Practice & Remedies Code

    § 129B.002 ...................................................................................................................4, 14

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

**Other Authorities**

E. Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173 (2025) ..........................................................................10

11A Wright & Miller, Federal Practice & Procedure Civil § 2954 (3d ed.)................................20

## INTRODUCTION

The Texas App Store Accountability Act, Tex. Bus. & Com. Code § 121.001 *et seq.*, requires everyone in Texas to prove their age before downloading mobile apps or accessing paid content within those apps. Minors must also obtain parental consent. The Act thus presumptively bans teens—like Plaintiffs M.F. and Z.B.—from accessing even political and educational material without their parents' permission. Parents must prove their authority to provide that permission. And parents who grant permission are forced to review the apps and paid content their child sees, even if—like M.F.'s mother—they believe such surveillance undermines their child's development.

The Act violates the First Amendment on its face. Governments have no "free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 (2011). Yet Texas has attempted just that—creating a system of content-based prior restraints that supplants parents' freedom to moderate their children's access to apps. This violates the rule that speech "neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," as well as the rule that the government has no "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 & 795 n.3 (citation and quotation marks omitted). Just as the State could not compel a bookstore to screen patrons and stop minors from buying books without their parents' permission, the State cannot ban minors from downloading apps or paid content without such consent. Strict scrutiny thus applies here, and the State cannot provide sufficient justification for the Act.

Plaintiffs are Texans and Texas-based organizations that the Act will restrict from communicating, accessing information, and engaging in protected expression. Because Plaintiffs will suffer the irreparable loss of fundamental freedoms if the Act takes effect in January 2026,

they bring this motion to preliminarily enjoin enforcement of the Act's challenged provisions.

## BACKGROUND

### A.    App stores are libraries for digital content.

App stores allow anyone with a smartphone and an internet connection to access the accumulated sum of virtually all recorded human knowledge. Through Apple's iOS App Store alone, more than 1 billion people have access to tens of millions of apps, published by more than 30 million app developers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 967 (9th Cir. 2023). Other major app stores in the United States include the Google Play Store for Android OS devices, the Amazon AppStore for Fire Tablets and Fire TV systems, the Galaxy Store for Samsung devices, and the Microsoft Store for Surface devices. Most Americans, and nearly all teenagers, use app stores to access, engage with, and contribute to the wealth of information and expression disseminated online. Sieff Decl. Exs. 1-3. Mobile apps are thus a major channel for humankind—and especially young people—to speak and learn. M.F. Decl. ¶¶ 3-11, 18.

The types of information distributed through app stores are "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 852 (1997) (cleaned up). Some applications, like internet browsers, are tools to search and discover information online. Others, such as WhatsApp, Discord, and Slack, provide messaging services for directed communication. Spotify, Netflix, Kindle, Audible, and similar apps contain libraries of copyrighted music, movies, television shows, books, audiobooks, and podcasts. Coursera, Codecademy, and Duolingo provide access to educational material. Media organizations—the Dallas Morning News, the Houston Chronicle, the New York Times, the Wall Street Journal, ESPN, Sports Illustrated, the Atlantic, and many others—offer apps that distribute reporting, essays, and videos. Some apps, like Substack, Medium, and Note, function as publishing studios to create and share music, writing, and other expressive content. Gaming apps like Roblox and Minecraft publish creative interactive worlds for exploration and entertainment. And of

course, social media apps like YouTube, X, Facebook, Instagram, TikTok, Reddit, and Snapchat provide fora for sharing every possible kind of digital media.

**B.    Plaintiffs access app stores for educational, artistic, and political speech.**

Plaintiffs are Texas-based teenagers and an organization seeking to reach teenagers that the Act will restrict from communicating, accessing information, and engaging in protected expression. Students Engaged in Advancing Texas (SEAT) represents a coalition of Texas students—from middle school to college-age—who seek to increase youth participation in policymaking, including through mobile apps. SEAT Decl. ¶¶ 1-9. M.F. is a 17-year-old high school student and photographer who uses apps and paid content—including social media apps and documentaries he purchases online—to follow the news, edit photographs, study, and conduct research for his debate team and other school activities. M.F. Decl. ¶¶ 6-9. Z.B. is a 16-year old high school student journalist and content creator who uses apps to socialize, study, report stories, follow current events, and publish valuable information regarding financial literacy and study skills to her audience of over 1 million teens. Z.B. Decl. ¶¶ 1-2, 5-11.

Mobile phones and apps are the dominant vehicles for young people's speech and communication. Sieff Decl. Exs. 1-3; M.F. Decl. ¶¶ 3-5, 18; Z.B. Decl. ¶¶ 3-4. Teens use apps for many things, including political advocacy, education, community, and creative expression. Sieff Decl. Ex. 4; M.F. Decl. ¶¶ 4-11; Z.B. Decl. ¶¶ 5-11; SEAT Decl. ¶¶ 5-9. Many apps provide training grounds for citizenship. Sieff Decl. Ex. 4; M.F. Decl. ¶ 8; SEAT Decl. ¶¶ 6, 8-9, 11-12. Apps offer an essential medium for young people to send and receive political and social messages. SEAT Decl. ¶¶ 4-9, 11-17; M.F. Decl. ¶¶ 4-5, 8-9. And apps enable young people to find purpose and community. Sieff Decl. Ex. 17; Z.B. Decl. ¶ 19. SEAT has built a network of students bound together by public policy advocacy using collaboration and social media apps. SEAT Decl. ¶¶ 2-9. Z.B. uses apps to explore her passion for a future career in finance, while inspiring other students

3

to pursue their own professional and academic goals. Z.B. Decl. ¶¶ 2, 8-9. And M.F. uses apps to inspire his photography projects and to gain new perspectives on public issues. M.F. Decl. ¶¶ 6-9.

**C.    Existing tools and laws already empower parents to control access to mobile apps and protect minors from adult content.**

App stores, mobile devices, and apps all allow parents to tailor their children's online experiences. *See* Sieff Decl. Exs. 14 ¶ 22, 15 ¶ 8, 16 ¶ 13. App stores allow parents to require parental consent for children to download some or all apps. Device makers permit parents to manage children's online activities, including use of particular applications. *Id.* Exs. 24, 25. And third-party apps allow parents to control access to their kids' social media and other accounts. *Id.* Exs. 20-23. With these tools, families are well-equipped to guide their children's app usage. *See* Fernandez Decl. ¶¶ 3-4; Z.B. Decl. ¶¶ 15, 17; Sieff Decl. Exs. 26-29 (scientific research).

Texas also already regulates children's access to content that lacks First Amendment protection. Since November 2023, H.B. 1181 has required commercial entities that "knowingly and intentionally publish[] or distribute[] material on an Internet website … more than one-third of which is sexual material harmful to minors" to "use reasonable age verification methods … to verify that an individual attempting to access the material is 18 years of age or older." Tex. Civ. Prac. & Rem. Code § 129B.002(a). The Supreme Court upheld the constitutionality of this provision in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025).

**D.    The Act age-gates and imposes a mandatory parental preclearance regime for apps and app-based information.**

Despite these tools and laws, Texas passed the Act, which the Attorney General may begin enforcing on January 1, 2026. *See* Tex. Bus. & Com. Code § 121.101.

The Act governs "app stores" operating in Texas and "software application developers" offering apps to users in Texas through app stores. *Id.* §§ 121.024, 121.051. Purportedly enacted to protect minors' mental and physical health, Sieff Decl. Exs. 5-7, 10, the Act creates an age-

verification and parental-consent regime, under which minors may not download apps or paid content within apps absent parental consent.

***Scope and exemptions.*** The Act broadly governs app stores—defined as any website, software, or other electronic service "that distributes software applications … to the user of a mobile device[,]" Tex. Bus. & Com. Code § 121.002(2)—as well as "software application developers" who make software available to users in Texas "through an app store[,]" *id*. § 121.051.

The Act applies only to apps a user downloads—and paid purchases within apps—on mobile devices, not to pre-installed apps, software available through web browsers, or apps on non-mobile devices such as internet-connected televisions. This leads to inconsistent regulation.

*First*, the same app sometimes is covered and sometimes falls outside the Act, depending on how it is distributed. The Apple Music app, for example, comes pre-installed on Apple iPhones and iPads, but must be downloaded on Android phones or Samsung TVs. Of these distribution options, the parental-consent requirement applies only to users who download the Apple Music app to an Android phone. This inconsistent regulation occurs not only between different users, but even across the same individual's different devices.

*Second*, materially identical apps are treated differently on the same devices: The iMessage app is preinstalled on an iPhone, but Signal must be downloaded. The Act regulates only the latter.

*Third*, the requirement for parental consent before a minor "make[s] a purchase in or using" an app, *id.* § 121.022(d)(3), applies differently to the same content across users. A minor who has the Disney+ app and a Disney subscription does not need parental consent to download *Finding Nemo*, yet another minor requires consent to rent the same movie in the Apple TV app—and neither needs consent to purchase the DVD at Best Buy.

The Act also exempts applications that provide users "with direct access to emergency

services," and apps "operated by or in partnership with a nonprofit" that "develops, sponsors, or administers a standardized test used for" admission to or placement "in a postsecondary educational institution." *Id.* § 121.022(h). As a result, the Act exempts test prep apps published by nonprofit test administrators—like College Board's Bluebook app or ACT Online Prep—yet applies to those published by other test prep nonprofits, like Khan Academy.

**Age-verification and parent-identification mandates.** Before anyone in Texas may download apps from an app store, or paid content within an app, the store must use "a commercially reasonable method" to "verify the individual's age category." *Id.* § 121.021(a). If the store determines that the user is under 18, it must deny her access to the content until she "affiliate[s] with a parent account belonging to [her] parent or guardian." *Id.* § 121.022(a).

To that end, app store owners are also required to use "a commercially reasonable method" to verify that the prospective parent account in fact belongs to an adult with "legal authority to make a decision on behalf of the minor." *Id.* §§ 121.021(a), 121.022(b)(1)-(2). The Act does not explain what information is sufficient to prove legal parental authority.

**Parental-consent mandate.** Affiliating with a verified parent is only the start. Each time a teen seeks to download an app—or purchase content within an already-downloaded app—they must "obtain consent" from their verified parent. *Id.* § 121.022(d)(1)-(3). Consent requires providing the parent with the app's state-mandated "age rating," based on one of several state-defined "age categories," as well as the "content or other elements" underlying the rating. *Id.* §§ 121.022(f)(1)(A)-(E), 121.052. Teens who cannot obtain consent may not access the app or content. *Id.* App stores also must share consent information with app developers, *id.* § 121.024(1), who must prohibit teens from accessing their apps or paid content absent consent, *id.* § 121.054.

Families that want no part of this state-ordered surveillance have no choice. Parents must

separately consent to "each individual download or purchase sought by the minor[,]" *id.* § 121.022(e)(1), and are prohibited from granting "blanket consent to authorize multiple downloads or purchases[,]" *id.* § 121.026(a)(3). And even after a parent consents, app stores must seek consent anew whenever the application's content ratings, "functionality," or "user experience" undergoes a "material[] change[]." *Id.* §§ 121.022(g), 121.053(b).

**Enforcement.** An app store that fails to enforce the State's restrictions may face penalties of up to $10,000 per violation under the Texas Deceptive Trade Practices Act. *Id.* §§ 17.01, 17.46. Given the millions of users in Texas, penalties under the Act could prove extraordinary.

## LEGAL STANDARD

A preliminary injunction should be granted where plaintiffs show that (1) they will likely prevail on the merits, (2) they will suffer irreparable injury absent relief, (3) their injury outweighs any harm to the party they seek to enjoin, and (4) the public interest supports an injunction. *Book People, Inc. v. Wong*, 91 F.4th 328, 336 (5th Cir. 2024). An injunction is warranted here.

## ARGUMENT

## I.    Plaintiffs Are Likely To Prevail On The Merits.

### A.    The Act restricts access to fully protected speech.

The First Amendment protects the creation, dissemination, and right to access ideas and expression. *See Brown*, 564 U.S. at 792 & n.1; *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 & 757 n.15 (1976). These protections apply without qualification to online media, *Reno*, 521 U.S. at 852-53, including information and ideas communicated through mobile applications distributed through app stores. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 718-19 (2024). They also apply to minors, who "are entitled to a significant measure of First Amendment protection," and whose rights to engage in fully protected speech "cannot be suppressed." *Brown*, 564 U.S. at 794-95 (citation omitted).

Online age-screens are always subject to First Amendment scrutiny because they "necessarily" burden the "First Amendment right to access speech." *Free Speech Coal.*, 606 U.S. at 495. The government thus "bears the burden of proving the constitutionality of its actions" that abridge these protections, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000), under some form of "heightened judicial scrutiny." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557, 563 (2011); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524, 532 (2022). Critically, the Act here is fundamentally unlike the Texas law upheld in *Free Speech Coalition* because it targets and restricts access to "fully protected" materials, not adult content minors have no First Amendment right to access. 606 U.S. at 482-85, 490-92 & n.12.

The Act's age-verification and parent-identification mandates, §§ 121.021, 121.022(a)-(b), 121.024(1), 121.126(b)(1)(A), 121.054(a)(1), and its parental-consent mandate, *id.* §§ 121.022(d)-(g), 121.024(2), 121.026(a)(3), 121.126(b)(1)(B), 121.053, 121.054(a)(2), 121.156(c), fail any First Amendment standard.

### B.    Strict scrutiny applies to the challenged provisions.

The Court should apply strict scrutiny for three independent reasons.

#### 1.    The challenged provisions create a system of prior restraint.

Strict scrutiny applies because the challenged provisions subject speech to several overlapping prior restraints. A prior restraint is any government action that in substance prevents or deters speech without a prior judicial determination "that such publications may lawfully be banned." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 70-71 (1963). Prior restraints present "the most serious and the least tolerable infringement on First Amendment rights," and bear a "heavy presumption" of invalidity. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976); *see also Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979). To survive review, a prior restraint must be the *only* means to address a "direct, immediate, and irreparable" interest of the highest

magnitude—a standard more stringent than strict scrutiny. *N.Y. Times Co. v. United States*, 403 U.S. 713, 730 (1971) (Stewart, J., concurring); *id.* at 726-27 (Brennan, J., concurring) (same).

At the outset, the Act's overall age-verification, content-classification, and preclearance regime effects a prior restraint by requiring app stores and developers to classify fully protected speech into suitable "age categories," Tex. Bus. & Com. Code § 121.021, and restrict how that content is disseminated. *See Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 678-88 (1968) (prior restraint to require theaters to classify films as "suitable for young persons" before screening them); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 n.8 (1975) (similar); *Bantam Books*, 372 U.S. at 67-69 (subjecting bookstores to supervision "inhibit[ed] the circulation of publications"). The Ninth Circuit enjoined a similar regime in *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024), holding that forcing online intermediaries to classify and block potentially harmful content "deputize[d] private actors into censoring speech" and failed strict scrutiny.

Each set of challenged provisions also independently constitutes a prior restraint. The age-verification and parent-identification mandates "impose[] a form of prior restraint" because they compel users—teens and adults—to provide age-identification and parental-authority documentation "as a condition of engaging in protected activity," thus preventing access to fully protected speech before it can occur and without adjudication. *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 n.9 (1983); *see Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316-17 (1980) (statutory precondition was prior restraint). Many Texans would stop using apps rather than provide ID. And some parents would rather deny their children access to apps than provide proof of parental authority. In fact, 66 percent of Americans "are not comfortable sharing their identification documents or biometric information with online platforms," and 70 percent are "uncomfortable with their children using such methods." *Free Speech Coal., Inc. v.*

*Rokita*, 738 F. Supp. 3d 1041, 1049 (S.D. Ind. 2024) (alterations omitted), *vacated on other grounds*, 2025 WL 2027434 (7th Cir. 2025). Their reluctance is understandable. *See* E. Goldman, *The "Segregate-and-Suppress" Approach to Regulating Child Safety Online*, 28 Stan. Tech. L. Rev. 173, 205 n.129, 206-08 (2025) (privacy risks of age verification cause self-censorship). These state-imposed barriers to speech are prior restraints. *See Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 277, 283 (5th Cir. 2003) ("pre-clearance" was prior restraint).

The parental-consent mandate adds another layer of prior restraint by establishing a *state-backed* "parental veto" over the information a teenager may access. *Brown*, 564 U.S. at 795 n.3. Plaintiffs M.F. and Z.B., who have a constitutional right to access non-obscene content in app stores' libraries, are banned from doing so by default. *See* Fernandez Decl. ¶¶ 7-9. This makes the Act akin to the law invalidated in *Brown*, 564 U.S. at 794-95, which banned minors from purchasing or renting constitutionally protected video games without parental approval, and not the law upheld in *Free Speech Coalition*, 606 U.S. at 482, which "regulates only speech that is obscene to minors." As in *Brown*, the Act's preclearance mandate unlawfully burdens the fully protected speech both of teens and those (like SEAT) who wish to speak with them. *See also, e.g.*, *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 932, 954-55 (S.D. Ohio 2025) (invalidating comparable age-verification and parental-consent regime under *Brown*).

## 2.    The challenged provisions cannot be justified without reference to the effect of content on its audience.

Strict scrutiny also applies because the challenged provisions are content-based. "A law can regulate the content of protected speech, and thereby trigger strict scrutiny, either 'on its face' or in its justification." *Free Speech Coal.*, 606 U.S. at 482. The latter category includes laws that cannot be justified without reference to "the direct impact that speech has on its listeners." *Boos v. Barry*, 485 U.S. 312, 321 (1988); *Playboy*, 529 U.S. at 811-12 (same).

10

The challenged provisions are content-based under this test. The Act's overall premise—that minors like M.F. and Z.B. must be shielded from fully protected but supposedly inappropriate information—is focused on content. *See Ashcroft v. ACLU*, 542 U.S. 656, 670 (2004) (strict scrutiny applies to laws "designed to protect minors from viewing harmful materials" (citing *Playboy*, 529 U.S. at 811-12)). Texas indisputably passed the Act for this reason. *See* Sieff Decl. Ex. 5 (committee report claims the Act addresses "growing concerns" that "pervasive[]" access to apps harms "children and teens"); *id.* Ex. 7 (bill author states the Act aims "to protect our children from inappropriate" and "dangerous content"); *id.* Exs. 6, 10 (witnesses and supporters praised the Act for "cracking down" on teens' "expos[ure]" to "inappropriate content" and "harmful material").

Texas may not create a "new category of content-based regulation" for minors. *Brown*, 564 U.S. at 794. Like other laws conditioning access to protected speech on parental consent, the Act is subject to strict scrutiny. *Id.* at 795 n.3 (video games); *Yost*, 778 F. Supp. 3d at 954-55 (social media); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1126 (D. Utah 2024) (same).

### 3. The challenged provisions are content-based because of the Act's coverage definition.

Strict scrutiny also applies because the Act's content-based coverage definition means the challenged provisions' *application* necessarily burdens speech based on its content. *See SEAT v. Paxton*, 765 F. Supp. 3d 575, 592-95 (W.D. Tex. 2025); *CCIA v. Paxton*, 747 F. Supp. 3d 1011, 1032 (W.D. Tex. 2024), *appeals docketed*, Nos. 24-50721, 25-50096 (5th Cir.) (cons.).[1]

Like the statute considered in those cases, the Act's arbitrary, content-based exemptions—

---

[1] Other cases finding statutes content-based due to similar coverage definitions include *NetChoice v. Carr*, 2025 WL 1768621, at *12 (N.D. Ga. June 26, 2025), *NetChoice, LLC v. Fitch*, --- F. Supp. 3d ----, 2025 WL 1709668, at *8 (S.D. Miss. 2025), *Yost*, 778 F. Supp. 3d at 953-54, *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164, 1186-91 (N.D. Cal. 2025), *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *9-10 (W.D. Ark. Mar. 31, 2025), and *Reyes*, 748 F. Supp. 3d at 1121-24.

excluding apps operated by nonprofits that provide "direct access to emergency services," "standardized test[s]," or support applications for "admission to" or placement "in a postsecondary educational institution[,]" Tex. Bus. & Com. Code § 121.022(h)—mean the challenged provisions' application "depend[s] entirely on the communicative content" a service provides. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). M.F. or Z.B. face no barriers accessing the College Board's BigFuture School app, but need parental approval to access the Austin American-Statesman app. Because the Act thus "defin[es] regulated speech by particular subject matter" and "singles out specific subject matter for differential treatment," *id.* at 163, 169, its every application is subject to strict scrutiny. *See, e.g.*, *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619-21 (2020) (plurality opinion) (law was content-based by virtue of its content-based coverage scheme).

### C.    The challenged provisions fail any level of First Amendment scrutiny.

"Strict scrutiny is unforgiving" and effectively "fatal" "absent truly extraordinary circumstances." *Free Speech Coal.*, 606 U.S. at 485. A law subject to strict scrutiny is presumptively invalid unless the government shows it is necessary to achieve a compelling interest and uses the least restrictive means. *See Playboy*, 529 U.S. at 813, 817. The challenged provisions fail this test as well as the intermediate scrutiny applicable to content-neutral regulations.

#### 1.    The challenged provisions are not necessary to directly and materially address any real, compelling interest.

While the State's purported interest in protecting minors' mental and physical health (Sieff Decl. Exs. 5-7, 10) may be compelling in general, the State "must present more than anecdote and supposition" to show the challenged provisions are necessary to *accomplish* that objective. *Playboy*, 529 U.S. at 822. The Act rests on no such evidence. *Cf.* Sieff Decl. Ex. 30 ¶¶ 10-44, 49 (expert report in similar case concluding that minors' access to app-based content is not linked to mental-health problems). Texas simply *assumes* that apps and downloaded content cause health

problems and then *asserts* that censorship is the solution. That baseless "predictive judgment" is not enough. *Brown*, 564 U.S. at 799-800 ("causal link" required).

Texas's lack of evidence is unsurprising. Apps benefit many young people, and there is no evidence of a causal link between app-distributed content and adverse effects in adolescents. *See* Sieff Decl. Exs. 18-19, 26-29. This is consistent with Plaintiffs' own experience. *See* M.F. Decl. ¶ 18; Z.B. Decl. ¶¶ 5, 7-8, 19. In fact, preventing teens from accessing apps could *harm* their mental health. *See* Z.B. Decl. ¶¶ 18-19; Sieff Decl. Ex. 30 ¶¶ 39-44.

Without evidence that the Act addresses any real harms, preventing teens from engaging with app content is not a legitimate government interest—no more than mandating early bedtimes, banning Harry Potter novels, or limiting time spent listening to Taylor Swift albums. Minors have a First Amendment right to access non-obscene speech. *Brown*, 564 U.S. at 794-95. "That the State finds expression too persuasive" or "catchy" for young people "does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 578; *see also Brown*, 564 U.S. at 798 (speech is no less protected because it is engaging). Nor does a concern that speech might be too distressing. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 185, 190-91 (2021) (profane criticism protected despite upsetting classmates); *Snyder v. Phelps*, 562 U.S. 443, 450-51, 458 (2011). These are decisions for families to make, not the government to mandate.

### 2. The challenged provisions are not the least restrictive means, much less narrowly tailored.

Even were Texas to have evidence that minors' current family-moderated access to app stores poses real harms justifying government action, the State cannot show that age screening *everyone* in Texas and banning minors from accessing *any* app store content without individualized parental consent is the "least restrictive" method to eliminate that harm. *Playboy*, 529 U.S. at 827.

Texas "could have easily employed less restrictive means to accomplish its protective

goals, such as by (1) incentivizing companies to offer voluntary content filters or application blockers, (2) educating children and parents on the importance of using such tools, and (3) relying on existing criminal laws that prohibit related unlawful conduct." *Bonta*, 113 F.4th at 1121; *see also, e.g.*, *Fitch*, 2025 WL 1709668, at *10; *Carr*, 2025 WL 1768621, at *18; *Yost*, 778 F. Supp. 3d at 956; *SEAT*, 765 F. Supp. 3d at 696, 698-99; *Reyes*, 748 F. Supp. 3d at 1127; *CCIA*, 747 F. Supp. 3d at 1036-37; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *6-8, *21 (W.D. Ark. Aug. 31, 2023). App stores and mobile devices allow parents to control the apps their children access. *See* Sieff Decl. Exs. 14 ¶ 22, 15 ¶ 8, 16 ¶ 13, 20-25; Fernandez Decl. ¶ 4 (describing use of such controls). And Texas *already* bans minors from accessing content they are not constitutionally entitled to see. *See* Tex. Civ. Prac. & Rem. Code § 129B.002(a).

The challenged provisions are thus also inherently overinclusive and not narrowly tailored, since their only additive applications are to burden adults and to ban minors from accessing "fully protected" app store content. *Free Speech Coal.*, 606 U.S. at 482-87, 490-93 & 493 n.12; *see Brown*, 564 U.S. at 794-95. Indeed, the Act is significantly more overinclusive than the law enjoined in *SEAT* and *CCIA*—and those enjoined in *Fitch*, *Carr*, *Yost*, *Reyes*, and *Griffin*—since it burdens and presumptively bans access to *any* app store content (apart from standardized testing or emergency services), not just large social media apps. Restricting access to vast libraries of protected content because *some* apps may potentially contain *some* less-than-fully-protected content "turns the First Amendment upside down." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002); *Reno*, 521 U.S. at 882.

It is no answer that the Act is "narrowly tailored" to aid parents. *Brown* rejected the notion that it "is a proper governmental means of aiding parental authority" to "punish[] third parties for conveying protected speech to children *just in case* their parents disapprove of that speech." 564

U.S. at 802. And that interest is especially inapt here, as the Act not only overrides parents by making the State's choices the default, *id.*, but forbids even willing parents from providing "blanket consent," Tex. Bus. & Com. Code § 121.026(a)(3). Some parents (like M.F.'s) would permit their children to access apps they are eligible to download. Fernandez Decl. ¶¶ 5, 7-9. Others might give blanket access to paid content in news and sports apps where kids can learn about the President's executive orders or watch Arch Manning highlights. Forcing parents to surveil their children and provide repeated consent on the State's terms abridges the "rights of young people" to access content their parents deem "harmless," *Brown*, 564 U.S. at 805, and undermines parents' ability to manage their households as they see fit, Fernandez Decl. ¶¶ 5-6, 10.

### 3.    The challenged provisions are also substantially underinclusive.

The Act's underinclusivity is also "alone enough to defeat it." *Brown*, 564 U.S. at 802. A law that professes to serve broad goals like preventing harm to minors, and yet regulates only a fraction of the harm's potential causes, "raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Id.* (citing cases). Here, as in *Brown*, the Act focuses on a small subset of media—non-native mobile apps disseminated through app stores, and paid content within apps—but excludes native apps, free content within apps, paid content available online but not in mobile apps, and content available via physical media; and arbitrarily exempts services that primarily provide access to educational content or emergency services. Tex. Bus. & Com. Code § 121.022(h)(1), (2). The Act thus "leave[s] significant influences bearing on [the State's] interest unregulated." *Tex. VFW of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) (citation omitted); *see also SEAT*, 765 F. Supp. 3d at 597 (law targeting social media apps underinclusive because "[a] teenager can read Peter Singer advocate for physician-assisted suicide in Practical Ethics on Google Books but cannot watch his lectures on YouTube or potentially even review the same book on Goodreads").

15

### 4.     The challenged provisions fail even intermediate scrutiny.

A speech restriction can survive intermediate scrutiny only if the government proves the law (1) serves a "real" and "not merely conjectural" government interest "unrelated to the suppression of free expression," and (2) "will in fact" serve that interest in "a direct and material way" (3) that is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662-64 (1994) (citation omitted). The challenged provisions fail this test too.

***No evidence the challenged provisions achieve a state interest.*** The State has no evidence that the Act advances its purported goal of protecting minors' mental and physical health.

*First*, the legislative record lacks evidence establishing that unmitigated access to libraries of protected content presents a real problem, much less that the Act's parental-consent regime for most—but not all—non-native apps actually addresses that or any problem directly. "[M]ere conjecture" positing the existence of a problem is not "adequate to carry a First Amendment burden[,]" and the State may not restrict speech because it *might* prevent *some* "anticipated harm." *FEC v. Cruz*, 596 U.S. 289, 307 (2022).

*Second*, nothing in the record shows the Act will help adolescents' wellbeing. *See Am. Acad. of Implant Dentistry v. Parker*, 860 F.3d 300, 309-10 (5th Cir. 2017) (state failed to carry its "significant" burden to show regulation actually protected consumers); *see also Edenfield v. Fane*, 507 U.S. 761, 771-72 (1993) (intermediate scrutiny requires direct evidence). In fact, Plaintiffs' testimony and scientific evidence show that restricting teens' access to apps and paid content will, for many, cause harm. *Supra* §§ I.C.1. And in any case, the Act arbitrarily exempts similar or even identical media depending on whether an app is native to a device or not. That is fatal. A law cannot advance the government's interests under intermediate scrutiny if it "undermine[s] and counteract[s]" its goals, *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995),

16

or "is so pierced by exemptions and inconsistencies" that it permits the very evils it purports to prevent, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 190 (1999).

*Third*, the Act fails intermediate scrutiny regardless because "correct[ing] the mix" of fully protected speech teens may access is "related to the suppression of free expression" and an impermissible basis to restrict speech under any standard. *Moody*, 603 U.S. at 740.

**No evidence of narrow tailoring.** Even a substantial government interest "cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 597 (2021) (citation omitted). The Act violates that rule, indiscriminately restricting access to *all information* published through app stores, including fully protected speech. There is no reason "why alternative, less-restrictive means" like voluntary parental controls or existing Texas law—which already bans minors from content obscene to them—"would not accomplish" the State's interest in protecting minors from unlawful material. *Express Oil Change, LLC v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 493 (5th Cir. 2019) (narrower alternative fatal under intermediate scrutiny). Texas was required to show the inadequacy of "less-burdensome alternatives." *Am. Acad. of Implant Dentistry*, 860 F.3d at 311; *see also Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 223-24 (5th Cir. 2011). It has not.

### D.    The Act's "material change" provision is unconstitutionally vague.

The Act's mandate that app stores revoke minors' access to an application whenever its content rating, "functionality," or "user experience" undergoes a "material[] change[]," Tex. Bus. & Com. Code §§ 121.022(g), 121.053(b), is independently invalid because it is unconstitutionally vague. A law is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Vague laws

regulating speech face an even more stringent test because their "uncertain meanings" lead regulated persons "to 'steer far wider of the unlawful zone'" by over-censoring. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (citation omitted); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010). Regulations of speech must thus be precise, *NAACP v. Button*, 371 U.S. 415, 433, 438 (1963), including when "aimed at protecting children from allegedly harmful expression." *Interstate Cir.*, 390 U.S. at 689.

The material change provision fails this test. *See, e.g.*, *Bonta*, 770 F. Supp. 3d at 1204-07 (phrase "materially detrimental" in speech regulation unconstitutionally vague). The Act does not define what changes are "material," nor what aspects of an app relate to its "functionality or user experience." When Spotify added podcasts alongside music, was that a material change? What about when the New York Times app adds a new puzzle game? Changes its home screen? The standard is subjective, meaning app stores will predictably and broadly revoke access to avoid liability.[2] *See Counterman v. Colorado*, 600 U.S. 66, 77-78 (2023) (citing *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). And given the volume of routine app updates—reorganizing menus, adding content, or modifying layouts—users will frequently lose parent-approved access.

### E. The Act's challenged provisions are facially invalid.

Facial relief is the proper remedy here. A regulation is facially invalid under the First Amendment if "a substantial number of [its] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Moody*, 603 U.S. at 723. This is a two-step analysis.

First, courts determine a challenged law's "full range of applications" (i.e., does it regulate speech in some, most, or all cases). *Id.* at 726. Here, *every* application burdens the "right to access

---

[2] Even assuming the question were whether parents would consider a "change" "material," app stores cannot reasonably guess what any given parent would think for any given child. *See Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) (law vague when avoiding liability turned on predicting third-party reactions to particular speech).

speech" by placing apps and paid content behind an age-gate. *Free Speech Coal.*, 606 U.S. at 495; *see, e.g.*, *Bonta*, 770 F. Supp. 3d at 1201-03 (age-verification provision facially invalid).

Second, courts decide which applications to speech "violate the First Amendment," comparing the constitutional and unconstitutional applications. *Moody*, 603 U.S. at 725-26. When the pertinent facts "are the same across the board" and the substantial effect of a law is to regulate speech without constitutional justification, the law is overbroad and facially invalid. *Ams. for Prosperity*, 594 U.S. at 618-19.

The analysis above, *supra* §§ I.A-D, demonstrates that *every* application of these challenged provisions to protected speech is unconstitutional. App stores provide access to "a wide array of protected First Amendment activity," *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017), "only a small portion of which falls outside First Amendment coverage[,]" *SEAT*, 765 F. Supp. 3d at 597 & 597 n.13; *see Brown*, 564 U.S. at 790-91 (unprotected speech is "narrowly limited"). The challenged provisions' facial validity thus boils down to a comparison between their substantial regulation of protected speech (none of which the State can show is constitutional) versus their catch-as-catch-can regulation of *unprotected speech* or *non-speech* purchases the provisions may incidentally reach. And even many of those incidental constitutional applications are irrelevant since Texas law *already* restricts online content unprotected for minors. *See City of L.A. v. Patel*, 576 U.S. 409, 418 (2015) (facial challenges concern applications that are not already legitimately authorized by other laws); *Spirit Aerosystems, Inc. v. Paxton*, 142 F.4th 278, 286-87 (5th Cir. 2025) ("[T]he test for facial challenges considers *only* applications where the statute *actually authorizes* the conduct, not those where the statute does no work[.]") (emphasis added).

Prophylactic, blanket regulations of speech just to shield minors from potential exposure to unprotected speech present the archetype of overbroad legislation that turns the First

Amendment on its head. *Ashcroft*, 535 U.S. at 255; *see also Butler v. Michigan*, 352 U.S. 380, 383 (1957); *Reno*, 521 U.S. at 882.

## II.    The Remaining Factors Favor A Preliminary Injunction.

The remaining preliminary injunction factors are also satisfied.

*First*, Plaintiffs will suffer irreparable harm absent relief. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see* SEAT Decl. ¶¶ 10-18, M.F. Decl. ¶¶ 12-16, 18-19, Z.B. Decl. ¶¶ 12-20; Fernandez Decl. ¶¶ 7-9; *see also Wong*, 91 F.4th at 340-41 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

*Second*, the equities and public interest support an injunction. Because the State is the defendant, these factors "merge," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and "the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment," *Wong*, 91 F.4th at 341.

## III.    The Court Should Not Require A Bond.

The Court has discretion to enter an injunction without requiring a bond because constitutional rights are at stake, *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996); 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2954 (3d ed.), and should not require one here.

## CONCLUSION

Plaintiffs request an order enjoining Tex. Bus. & Com. Code §§ 121.021, 121.022(a)-(b), 121.022(d)-(g), 121.024, 121.026(a)(3), 121.026(b), 121.053, 121.054, and 121.056(c) on their face or, at a minimum, awarding any facial or as-applied injunctive relief the Court deems appropriate.

Respectfully submitted,

/s/    *Erwin Reschke*
        Erwin Reschke

Adam S. Sieff*                                    Ambika Kumar*
Haley B. Zoffer*                                  Erwin Reschke (TX Bar #24110264)
DAVIS WRIGHT TREMAINE LLP          DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor    920 Fifth Avenue, Suite 3300
Los Angeles, California 90071            Seattle, Washington 98104
Telephone: (213) 633-6800                Telephone: (206) 622-3150
adamsieff@dwt.com                         Facsimile: (206) 757-7312
haleyzoffer@dwt.com                       ambikakumar@dwt.com
                                                      erwinreschke@dwt.com

Abigail B. Everdell*
DAVIS WRIGHT TREMAINE LLP          David M. Gossett*
1251 Avenue of the Americas, 21st Floor  Celyra Myers*
New York, NY 10020                        DAVIS WRIGHT TREMAINE LLP
Telephone: (212) 603-6488                1301 K Street NW, Suite 500 East
abigaileverdell@dwt.com                   Washington, DC 20005
                                                      Telephone: (202) 973-4200
                                                      davidgossett@dwt.com
                                                      celyramyers@dwt.com

*Attorneys for Plaintiffs*

                                                      *pro hac vice application forthcoming

October 16, 2025

## CERTIFICATE OF SERVICE

I certify that on October 16, 2025, the foregoing was filed electronically with the Court's CM/ECF system. Plaintiffs will also cause the foregoing to be served by mail and electronic mail to:

> Kimberly Gdula
> Office of the Texas Attorney General
> Capitol Station, P.O. Box 12548
> Austin, TX 78711-2548
> kimberly.gdula@oag.texas.gov

*/s/      Erwin Reschke*
Erwin Reschke

## CERTIFICATE OF CONFERENCE

I certify that on October 16, 2025, before filing in this Court, counsel for Plaintiffs contacted counsel at the Office of the Texas Attorney General about the relief requested in this motion. Counsel in that office would not consent to provide the relief requested by this motion.

*/s/      Erwin Reschke*
Erwin Reschke