IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| STUDENTS ENGAGED IN ADVANCING TEXAS; M.F., *BY AND THROUGH NEXT FRIEND* VANESSA FERNANDEZ; AND Z.B., *BY AND THROUGH NEXT FRIEND* S.B., <br><br> *PLAINTIFF,* <br><br> V. <br><br> KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS, <br><br> *DEFENDANT.* | CASE NO. 1:25-CV-01662-RP |
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, <br><br> PLAINTIFF, <br><br> V. <br><br> KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS, <br><br> DEFENDANT. | CASE NO. 1:25-CV-01660-RP |

**KEN PAXTON'S JOINT REPLY IN SUPPORT OF DEFENDANT'S MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**

Defendant Ken Paxton, in his official capacity as Attorney General of Texas, ("Defendant"), hereby files this Joint Reply in Support of Defendant's Motions for Stay Pending Appeal to the United States Court of Appeals for the Fifth Circuit from the orders of the Court in the above-referenced action entered on December 23, 2025, granting Plaintiffs' Motions for Preliminary Injunction. ECF No. 38, Case 1:25-cv-01662-RP and ECF No. 65, Case 1:25-cv-01660-RP.

TABLE OF CONTENTS

Table of Contents ...................................................................................................ii

Index of Authorities ............................................................................................. 1

Background ........................................................................................................... 3

Argument and Authorities ................................................................................... 3

    I.   The Claimed Burden on Plaintiffs is Overstated ............................................. 3

    II.  Plaintiffs Understate the Interests of the State and Public ............................. 6

    III. Recent Decisions in Child Protective Laws Support Lifting Stay................................11

        A.  *CCIA & NetChoice v. Uthmeier*, No. 25-11881 (11th Cir. Nov. 25, 2025)..................11

        B.  *NetChoice, LLC v. Fitch*, 606 U.S. _____, 145 S.Ct. 2658 (Mem. Op.) (2025)...... 12

        C.  *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025). ............................................ 12

Conclusion and Prayer ....................................................................................... 12

Certificate of Service.......................................................................................... 14

INDEX OF AUTHORITIES

**Cases**

*CCIA & NetChoice v. Uthmeier*,
   No. 25-11881 (11th Cir. Nov. 25, 2025) .................................................................. 5, 11

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) ........................................................................................................ 8

*Free Speech Coal., Inc. v. Paxton*,
   606 U.S. 461 (2025) ...................................................................................................... 12

*L.W. ex rel. Williams v. Skrmetti*,
   73 F.4th 408 (6th Cir. 2023) ......................................................................................... 7

*NetChoice, LLC v. Fitch*,
   606 U.S. ____, 145 S.Ct. 2658 (2025) (mem. op.) ............................................... 11, 12

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................................................ 7

*Sable Commc'ns of Cal. v. FCC*,
   492 U.S. 115 (1989) ........................................................................................................ 7

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 564 (2011) ........................................................................................................ 7

*Winter v. NRDC*,
   555 U.S. 7 (2008) ............................................................................................................ 3

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ........................................................................................................ 7

*Zbaraz v. Madigan*,
   572 F.3d 370 (7th Cir. 2009) ......................................................................................... 7

**Statutes**

Tex. Bus. & Com. Code § 121.021 .................................................................................... 4

Tex. Bus. & Com. Code § 121.022 .................................................................................... 4

Tex. Bus. & Com. Code § 121.053(b)(2) .......................................................................... 9

**Other Authorities**

*How Dare They Peep Into My Private Life? Children's Rights Violations by Governments That Endorsed Online Learning During the Covid-19 Pandemic*, HUM. RTS. WATCH, (May 25, 2022), https://www.hrw.org/report/2022/05/25/how-dare-they-peep-my-private-life/childrens-rights-violations-governments..................................................................................................... 10

*Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, U.S. DEP'T HEALTH & HUM. SERVS., 9 (2023), https://tinyurl.com/m64xzwjx........................................................ 8

*YouTube Terms of Service*, YOUTUBE (DEC. 15, 2023), https://www.youtube.com/static?template=terms ................................................................ 10

BACKGROUND

S.B. 2420, the App Store Accountability Act (the "Act") amends current law related to the sale and distribution of software applications for mobile devices. The Bill Analysis, detailing the Author's/Sponsor's Statement of Intent, also explains the States' interest:

> Growing concerns regarding the rise of social media and its pervasiveness in the lives of children and teens leave parents in the position of grasping for the best ways to protect their children. Unlike brick and mortar stores which must verify a consumer's age before the purchase of age restricted products such as alcohol and cigarettes, minors are currently able to navigate through the digital world without such parameters.
>
> The App Store Accountability Act remedies this by requiring app stores to gain consent from parents to consent to the use of mobile applications by their minor children and, additionally, to provide information from the app developers regarding the app's rating and the reasoning for the rating. App stores have touted that they already employ age verification, so this simply provides additional framework, transparency, and enforcement to protect the children of Texas.

S.B. 2420 Bill Analysis (July 8, 2025), p. 1 (ECF No. 7-9) (Case 1:25-cv-01660-RP).

ARGUMENT AND AUTHORITIES

The Supreme Court has emphasized that "a preliminary injunction is an extraordinary remedy never awarded as of right," and that courts must "pay particular regard for the public consequences" of enjoining state laws. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). In Plaintiffs' Response to Defendant's Motion for Stay Pending Appeal,[1] Plaintiffs incorrectly weigh the interests and rights of the parties, downplaying the interests of Texas and the public, while inflating their own claimed burden.

## I.  The Claimed Burden on Plaintiffs is Overstated

Plaintiffs point to the conclusory statements of their Declarants in alleging harm. In the

---

[1] ECF No. 46, Case 1:25-cv-01662-RP; ECF No. 73, Case 1:25-cv-01662-RP

CCIA lawsuit, Amici briefs were filed that directly contract the claims that the Act would be burdensome. The Coalition for a Competitive Mobile Experience ("CCME"), a trade association of app developers, directly stated that:

> From CCME's perspective, the Texas App Store Accountability Act ("ASAA" or "the Act") is a workable, commercially reasonable approach that standardizes obligations at the app-store level and clarifies the respective responsibilities of app stores and developers. CCME's members either already comply with similar age-assurance requirements elsewhere or have built the systems necessary to do so. CCME does not view ASAA's technical requirements as novel, untested, or unmanageable.

Brief for CCME as Amicus Curiae at 1 (ECF No. 59), *Computer & Commc'ns Indus. Ass'n v. Paxton*, (No. 1:25-cv-01660) (W.D. Tex., Dec. 15, 2025).

The Act does not require app stores or developers to invent new technologies or adopt unfamiliar operations. It merely formalizes practices that already exist, including age-aware accounts, parental approval flows, app age-ratings, and the signaling of user age and consent. As previously discussed in the State's Motion, many of these features are either already required under federal consent decrees or have already been implemented voluntarily. *See id.* at 2 (citations omitted). As noted in the original Motion, the Act requires only "commercially reasonable" actions be taken, limiting—if not eliminating—the speculative harms conjured by Plaintiffs. *See* Tex. Bus. & Com. Code §§ 121.021–121.022.

Plaintiffs' members, which include Apple and Google, already implement age ratings, parental controls, and content moderation systems on their platforms. The incremental burden of complying with S.B. 2420's requirements is minimal for companies that generate billions of dollars annually. Moreover, Plaintiffs have repeatedly claimed that their members already provide parental controls. If that is true, then the Act merely codifies best practices. If it is not true—if current industry practices are inadequate to protect children—then it is even more imperative that

the law be allowed to take effect.

Further, to the extent Plaintiffs' members face compliance costs, those costs flow directly from business decisions to market products to children without adequate safeguards. Companies that designed addictive features to maximize engagement such as infinite scroll, push notifications, autoplay video, and algorithmic content curation, now complain about the cost of mitigating the harms those features cause. This Court should not reward those actions. *See generally CCIA & NetChoice v. Uthmeie*r, No. 25-11881 (11th Cir. Nov. 25, 2025) (granting a stay of the lower court's preliminary injunction against enforcement of Florida's similar social media law, H.B. 3). Plaintiffs' members are making money, in part, by monetizing minors' information; commercially reasonable actions to protect those minors are entirely justified.

As pointed out by the Amicus Brief from CCME, "The compliance steps [Plaintiff] describes—building or refining age-verification flows, wiring parental-consent signals, and mapping existing ratings into four statutory age buckets—are routine engineering projects for companies that run global platforms. Most of these systems already exist within existing app stores." Brief for CCME as Amicus Curiae at 3 (ECF No. 59), *Computer & Commc'ns Indus. Ass'n v. Paxton*, (No. 1:25-cv-01660) (W.D. Tex., Oct. 16, 2025).

In short, app stores already:

- maintain age-aware accounts for minors and adults;
- affiliate minor accounts to parent or guardian;
- share anonymous signals with app developers;
- provide the capability for parents to consent to app downloads in advance; and
- block or permit downloads and purchases based on parental decisions.

The Act does not require that app stores do anything categorically different. It merely requires them to use these existing technologies for all Texas users, standardize age categories, ensure that a verified adult with legal authority stands behind each minor's account, and ensure

parental approval for minors to download apps. It also adds that the measures it is asking for are both "commercially reasonable" and applies a safe harbor for "widely adopted industry standards." Plaintiffs can satisfy these duties using the same classes of methods they already use to comply with federal law and their own product commitments—a *de minimis* burden.

The Act in this case provides parents with information and the tools to make better, effective choices in protecting their children without authorizing the state to police any app's content or censor anything said on an app. S.B. 2420, in requiring age verification to access app store products and in requiring age rating of all apps, does not regulate speech—any decisions regarding the access of minor children are taken by the parent, and not the state.

In short, the Act only incidentally affects any First Amendment concern, affects commercial speech, and merely guarantees that the parents of minors are provided with accurate consumer information so that their children may be better protected. It does not restrict any ideas, does not discriminate based on any viewpoint, and falls squarely within Texas's authority over truthful labeling, minors' contract capacity, and child protection. Any effect on speech is incidental and minimal.[2]

## II.  Plaintiffs Understate the Interests of the State and Public

Apart from the likelihood of success on the merits, courts must consider whether the applicant will be irreparably injured absent a stay, whether a stay will substantially injure the other

---

[2] Plaintiffs allege that Defendant "conceded" the law was content-based (Plaintiffs' Response, p. 2), but has stretched the statements of defense counsel past their limits. First, within the answer partially quoted, it was stressed that the Act deals with "contracts, not content." Prelim. Inj. Hrg. Tr. 24:24-25:4. The lead sentence speaking of content was in the context of harms to be prevented (like children seeing child pornography—which is not a First Amendment issue). But the method chosen to protect children: (1) chose a content-neutral method of doing so (*Id.* at 30:3-7); and (2) does so by allowing the *parent* to make the decision—avoiding state action, as discussed *infra*. Plaintiffs also ignore the Act's extremely strong severability language that should allow the Act to survive. *Id.* at 30:15-31:17.

parties, and where the public interest lies. *Nken v. Holder, 556 U.S. 418, 426* (2009) (listing factors courts consider before granting a stay) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The last two factors "merge when the Government is the opposing party." *Id*. at 435. The Supreme Court has "recognized that there is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Cal. v. FCC*, 492 U.S. 115, 126 (1989). The Sixth Circuit has held that a state's "interests in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in favor of the State." *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421–22 (6th Cir. 2023). It is uncontested that a state has a strong interest in applying its own laws. Added to this however is the very valid shared interest of the public—specifically including parents and guardians—to protect children from harm. *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) ("This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). All of these strong interests are harmed by a stay of the Act.

Initially, it must be noted that Plaintiffs do not explain how the sections of the Act which provides parents with authority to supervise their children's app usage create a First Amendment issue in the first place. These sections don't regulate Plaintiffs' members' content moderation, so they don't implicate their First Amendment speech rights. Because the law simply gives a parent the ability to limit a minor's app or social media usage, it is not ultimately the State doing the restricting. To the extent this is even a First Amendment restriction, it is easily justifiable under any level of scrutiny. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 564, 573 (2011) ("[P]rivate decision making can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge."); *see also Zbaraz v. Madigan*, 572 F.3d 370, 388 n.11 (7th Cir. 2009) ("The

State also has a well-established interest in protecting the parent's right to make decisions about the upbringing of her children."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (finding that in the context of ID requirements for another important right, the right to vote: "the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting.").

The U.S. Surgeon General also reports that "social media platforms can be sites for predatory behaviors and interactions with malicious actors who target children and adolescents." *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, U.S. DEP'T HEALTH & HUM. SERVS., 9 (2023), https://tinyurl.com/m64xzwjx. The predatory behaviors include: (1) sexual exploitation; (2) financial extortion; and (3) attempts to sell illegal drugs. *Id*. These are harms that are occurring and that will continue to occur under a stay. Moreover, these harms to the public are not speculative or imaginary:

> Every moment without protective measures like S.B. 2420 leaves Texas children exposed to harms that are concrete, documented, and in many cases catastrophic: suicides following chatbot interactions, sexual exploitation on "child-safe" platforms, algorithmic spirals into self-harm content, and gaming environments designed to mimic addictive gambling for minors. These harms accumulate daily and cannot be undone. They are occurring now, in real time, to real families.

Brief for Bipartisan Technology Scholars as Amicus Curiae, at 4 (ECF No. 57), *Computer & Commc'ns Indus. Ass'n v. Paxton*, (No. 1:25-cv-01660) (W.D. Tex., Dec. 12, 2025)).

A number of the serious, developing problems designed to be addressed by the Act were brought up at the December 16, 2025, hearing:

> Between 2005 and 2017, major depressive episodes among 12-to-17-year-old girls increased 52 percent. Hospital admissions for self-harm tripled among 10-to-14-year-old girls, and among the same group, suicide doubled. And things haven't gotten better since 2017. According to the 2023 Youth Risk Behavior Survey, 39.7

> percent of high school students experienced persistent feelings of sadness and hopelessness, 28.5 percent experience poor mental health. 20.4 percent experience—or seriously considered attempting suicide. And most shockingly, 9.5 percent had attempted suicide . . . .

Prelim. Inj. Hrg. Tr. 26:23–27:11.

Additionally, app developers—under a stay of the Act—are free to bind minors to one-sided contracts of adhesion without a parent's knowledge or consent. Currently, before a minor can download an app from Apple's App Store or Google's Play Store, the minor must accept the app's terms of service. Those terms of service operate as contracts, often requiring the minor to waive important rights, such as the ability to seek legal recourse for any damages caused by the app. To protect minors, the Act voids such contracts unless a parent or legal guardian consents to the terms. The First Amendment offers no protection for contractual or deceptive conduct. Here, Texas regulates commercial conduct—the formation and enforcement of contracts with minors—not expressive speech.

This same type of adhesion contract, as well as later changes in the terms of service, also applies to private information gathered about a given minor. The developer later makes a significant change to its terms of service including, among other things, changing the "type or category of personal data collected, stored, or shared by the developer," the parent or guardian must receive notice, so they can reconsider their consent to the contract. Tex. Bus. & Com. Code § 121.053(b)(2). Without that protection in place, minors may well be—unknowingly—agreeing to have their information shared or be commercially taken advantage of.

For example, under YouTube's terms of service, minors waive compensation for all their creative works they upload. In contrast, Google retains broad rights to use and monetize the child's content. *See YouTube Terms of Service*, YOUTUBE (DEC. 15, 2023),

https://www.youtube.com/static?template=terms ("You grant to YouTube the right to monetize your Content on the Service . . . . This Agreement does not entitle you to any payments."). And while YouTube permits "children of all ages [to] use [YouTube] and YouTube Kids (where available) if enabled by a parent or legal guardian," they note that parents "of a user under the age of 18, by allowing [their] child to use the Service, [] are subject to the terms of this Agreement and responsible for [the parents'] child's activity on the Service." *Id*. So, under the status quo, parents can be bound to their minor child's online actions and contracts, even if the parent never had the opportunity to review the child's actions. S.B. 2420 is designed to equip parents with the ability to conduct precisely that type of review.

Google limits its liability for any damages its products cause to the child. *Id*. (YouTube "will not be responsible" for losses, whether the claim is based on "warranty, contract, tort, or any other legal theory"). And YouTube further reduces the statute of limitations to one year and caps damages at $500. *Id*.

YouTube is hardly unique in its practices; Human Rights Watch has determined that most of the kids' educational apps share the children's data with advertising companies. *How Dare They Peep Into My Private Life? Children's Rights Violations by Governments That Endorsed Online Learning During the Covid-19 Pandemic*, HUM. RTS. WATCH, (May 25, 2022), https://www.hrw.org/report/2022/05/25/how-dare-they-peep-my-private-life/childrens-rights-violations-governments.

Children deserve protection from these types of business practices. And, while Plaintiffs complain about privacy concerns, they conveniently make no mention of the app industry's long-standing, standard practice of selling minors' data without confirming that an adult has ever seem

the terms of their policies. *See, e.g.,* Brief of Digital Childhood Alliance as Amicus Curae at 5 (ECF No. 56), *CCIA v. Paxton*, (Case No. 1:25-cv-01660-RP) (Dec. 10, 2025) ("Developers then profit from their "free" apps by selling [minors'] data.").

### III. Recent Decisions in Child Protective Laws Support Lifting Stay

#### A. *CCIA & NetChoice v. Uthmeier*, No. 25-11881 (11th Cir. Nov. 25, 2025).

The Eleventh Circuit, citing Justice Kavanaugh's concurrence in *NetChoice, LLC v. Fitch*, 606 U.S. ____, 145 S.Ct. 2658 (2025) (mem. op.), granted Florida's motion to stay a preliminary injunction against H.B. 3, Florida's similar social media law. "Plaintiffs have not shown that the injuries they face outweigh this harm to the State. The district court found plaintiffs faced the injuries of loss of First Amendment freedoms and unrecoverable compliance costs. But, as we have determined, it is unlikely that HB3 inappropriately curtails any First Amendment rights." *CCIA & NetChoice v. Uthmeier*, No. 25-11881 at *24 (11th Cir. Nov. 25, 2025). The court added that compliance costs for plaintiffs were not sufficiently burdensome to overcome state interests: "the compliance costs plaintiffs might incur do not outweigh the State's interest in enforcing its lawful regulation." *Id.* The court emphasized that "the public also has an interest in the protection of children and the enforcement of the State's law that seeks to do just that." *Id.* at *25.

Significantly, the Eleventh Circuit noted that H.B. 3 was inherently content-neutral, because, like S.B. 2420, it was directed at "social media platforms' ability to contract with children under a certain age[.]" *Id.* at *11. The court further noted that the regulation's definitions of "social media platform" and "addictive features" did not refer to any "type of content involved." *Id.* The same is true for S.B. 2420.

**B.  *NetChoice, LLC v. Fitch*, 606 U.S. _____, 145 S.Ct. 2658 (Mem. Op.) (2025).**

In *Fitch*, the Court examined Mississippi's H.B. 1126, which required age verification and parental consent for minors to access social media. The law appeared to be more restrictive than the present Act. Nevertheless, Justice Kavanaugh stated in his concurring opinion that he thought NetChoice "demonstrated that it is likely to succeed on the merits[.]" *Id.* at *1–2 (Kavanaugh, J., concurring in the denial). Yet, NetChoice's application for a stay was denied, despite Justice Kavanaugh's perception that they might ultimately prevail—evidencing that a party is not entitled to a stay merely on the probability of ultimate success, but must make a sufficient showing of harms and equities in order to earn a stay. *See id.* at *2 ("In short, under this Court's case law as it currently stands, the Mississippi law is likely unconstitutional. Nonetheless, [] NetChoice has not sufficiently demonstrated that the balance of harms and equities favors it at this time[.]"). This concurrence, acknowledging likely success on the merits while still allowing the law to take effect, reflects the Court's recognition that the balance of equities in child-protection cases cannot ignore the ongoing harms that injunctions permit to continue.

**C.  *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025).**

In this case, the Supreme Court rejected challenges to Texas's age-verification requirements for pornographic websites, affirming that states have legitimate authority to protect children from online harms. The Court rejected the argument that age verification automatically triggers strict scrutiny, holding instead that such requirements impose only a "modest burden" on adult speech. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 487 (2025).

### CONCLUSION AND PRAYER

The injunctions against S.B. 2420's protective measures leave Texas children exposed to

harms that are concrete and documented. These harms will continue daily for as long as the injunctions remain in place. The compliance costs Plaintiffs allege, by contrast, are overstated and self-inflicted by companies' utilization of business models that profit from contracting with minors. Regardless, the claimed costs are vastly outweighed by the state's compelling interest in protecting minors.

ACCORDINGLY, Defendant respectfully urges this Court to stay the preliminary injunctions of S.B. 2420 during the pendency of appeal. Defendant also prays for such other and further relief, at law or in equity, that it is justly entitled to.

Date: February 13, 2026

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**RYAN D. WALTERS**
Deputy Attorney General for Legal Strategy

**RYAN G. KERCHER**
Chief, Special Litigation Division
Texas Bar No. 24060998

Respectfully submitted.

/s/ *Zachary W. Berg*

**ZACHARY W. BERG**
Special Counsel
Texas Bar No. 24107706

**STEVEN B. LOOMIS**
Special Counsel
Texas Bar No. 00793177

**JACOB DUSTIN**
Assistant Attorney General
Texas Bar No. 24149843

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Zachary.Berg@oag.texas.gov
Steven.Loomis@oag.texas.gov
Jacob.Dustin@oag.texas.gov

**COUNSEL FOR DEFENDANT PAXTON**

13

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 13, 2026 and that all counsel of record were served by CM/ECF.

/s/ *Zachary W. Berg*
**ZACHARY W. BERG**